## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION

JAMIE BURGOS,

        Plaintiff,

v.

EMPEROR'S TAMPA INC. dba
EMPEROR'S GENTLEMEN'S CLUB
fka "DIAMONDS", a Florida Corporation;
ENTERTAINMENT 2851 LLC, dba
EMPEROR'S GENTLEMEN'S CLUB fka
"DIAMONDS" a Florida Limited Liability
Company;  MICHAEL TOMKOVICH, an
individual; and DOES 1 through 10,
inclusive,

        Defendants.

_____

Case No.: 8:22-cv-01171-KKM-TGW

**DECLARATION OF JUSTICE TURNER, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

/

I, Justice D. Turner, based on my own experience and knowledge, hereby declare as follows:

1.      I am an attorney licensed to practice before all Courts in the State of California. I am licensed Pro Hac Vice in the Middle District of Florida for this instant action. I am the handling attorney at Carpenter & Zuckerman on this matter, and counsel of record for plaintiff Jamie Burgos. I make this declaration of my own personal knowledge, and if called to testify, I could and would competently testify hereto under oath as follows. I offer this declaration in support of Plaintiffs' motion for partial summary judgment.

2.      Attached hereto as Exhibit 1 is a true and correct copy of an independent contractor agreement, produced by Defendants in discovery, titled "PERFORMER LICENSE AND TEMPORARY SPACE LEASE AGREEMENT" between Emperor's Defendants and Plaintiff which Plaintiff signed in 2018.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the deposition transcript of Defendant Michael Tomkovitch.

4.      Attached hereto as Exhibit 3 is a true and correct copy of an independent contractor agreement, produced by Defendants in discovery, titled "PERFORMER LICENSE AND TEMPORARY SPACE LEASE AGREEMENT" between Defendants and Plaintiff which Plaintiff signed in 2021.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Los Angeles, California.

Dated: September 22, 2023                _/s/ Justice D. Turner_____
                                    Justice D. Turner, Esq.

# EXHIBIT 1



# PERFORMER LICENSE
## AND TEMPORARY SPACE LEASE AGREEMENT

**NOTICE: THIS IS A LEGAL CONTRACT THAT AFFECTS THE LEGAL RIGHTS OF THE PARTIES TO THIS AGREEMENT- READ IT!**

**BUSINESS NAME** _EmTB_ (the "BUSINESS" or "CLUB")

## I. PERFORMER INFORMATION

**PLEASE MAKE SURE THAT ALL INFORMATION IS PRINTED IN A LEGIBLE AND CLEAR MANNER**

**LAST NAME:** _Burgos_

**FIRST NAME:** _Jamie_

**DATE OF BIRTH:** _8/15/82_

**STAGE NAME:** _Ariela_

**ADDRESS:** _538 Avocado Dr Brandon fl 33510_

    STREET          CITY        STATE      ZIP CODE

**PRIMARY PHONE** _(813) 450 7332_ **PHONE:** _____ **ADDITIONAL**

**DRIVERS LICENSE:** _B620 437 80 715 0_ (LIST ISSUING STATE AND NUMBER, ATTACH A COPY)

**SECONDARY FORM OF IDENTIFICATION:** _____

**NOTICE: All ID must comply with House Bill 989, requiring the Club to maintain a copy of the Applicant's Driver's License, State or Federal Government Issued Photo ID, and a record of the verification of the validity of identity and age verification document with the issuer.**

**SOCIAL SECURITY NUMBER:** _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_

**EMERGENCY CONTACT INFORMATION:** _tanya holessapple (813) 625 3048_

**DATE THIS FORM COMPLETED:** _8-6-18_

## II. ACKNOWLEDGEMENTS OF VOLUNTARY AND MEANINGFUL REVIEW OF THIS AGREEMENT

PERFORMER ACKNOWLEDGES THAT PERFORMER HAS READ AND REVIEWED THIS AGREEMENT, INCLUDING THE INCLUDED TERMS AND CONDITIONS, IN ITS ENTIRETY, and THAT PERFORMER HAS BEEN GIVEN AN OPPORTUNITY TO ASK THE CLUB ANY QUESTIONS OR EXPRESS ANY CONCERNS ABOUT THIS

1

PERFORMER 

DOCUMENT, AND THAT <u>PERFORMER HAS HAD AN OPPORTUNITY TO</u> <u>CONSULT WITH AN ATTORNEY OF HIS OR HER CHOICE</u> PRIOR TO ENTERING INTO THIS AGREEMENT. PERFORMER ACKNOWLEDGES THAT, BY SIGNING THIS AGREEMENT, PERFORMER UNDERSTANDS THE TERMS AND CONDITIONS OF THIS AGREEMENT AND KNOWINGLY AND FREELY AGREES TO ABIDE BY THEM.

THIS AGREEMENT REPLACES AND SUPERSEDES ANY PRIOR AGREEMENT BETWEEN THE PARTIES, AND SINCE THIS AGREEMENT IS THE MOST ACCURATE DESCRIPTION OF THE NATURE OF THE RELATIONSHIP OF THE PARTIES, AND REPRESENTS WHAT THE "MEETING OF THE MINDS" HAS BEEN SINCE THE PARTIES ESTABLISHED THEIR RELATIONSHIP, THE TERMS AND CONDITIONS HEREIN ARE DEEMED EFFECTIVE FROM THE DATE OF ANY PRIOR AGREEMENT OR RELATIONSHIP BETWEEN THE PARTIES, SHOULD ONE EXIST.

III. THE AGREEMENT

THIS AGREEMENT, is made this _6_ day of _August_, 20_18_, by and between ___EmtB___ hereinafter referred to as "Business," and _____, hereinafter referred to as "PERFORMER."
WHEREAS: The Business has the authority to License and/or lease time, stage space, VIP rooms, dressing rooms and stage access to PERFORMER at its nightclub by contractual arrangements;
WHEREAS: PERFORMER is a self-employed, independent entity engaged in PERFORMER's independently established business, and PERFORMER *elects not to be classified as an employee*, and agrees to maintain performance characteristics consistent with non-employee status;
WHEREAS: PERFORMER desires to obtain stage use and time at facilities under contract with Business via a nonexclusive license/lease (the "License"), from time to time, to entertain audiences in order that PERFORMER may earn income in the form of retaining the Business' "dance fees," which would, if the PERFORMER was classified as an employee, be the property and income of the Business, as well as gratuities from the Business' patrons derived from providing entertainment appearances; it is AGREED that the PERFORMER and the Business enter into the following AGREEMENT, and, that in consideration of the mutual covenants contained herein, the parties agree as follows:

<u>GENERAL TERMS:</u>

*<u>NATURE OF RELATIONSHIP:</u>*

<u>The Business and Performer each acknowledge and agree that the relationship of the parties hereto is that of The Business as "Licensor" and "Lessor" and Performer is a Licensee and Temporary Space Lessee and no employee/employer relationship exists between the Business and Performer. Nothing in this Agreement shall be construed so as to create an employee/employer relationship between the parties hereto. Performer shall be solely responsible for obtaining and maintaining, at Performer's sole cost and expense, all necessary business licenses and permits and insurance including but not limited to, health, disability and worker's compensation and for paying all federal, state and local taxes and contributions imposed upon any income earned by Performer at the Business.</u>

2

PERFORMER ᒍᑐᗷ

**The Business and Performer acknowledge and represent that if the relationship between them was that of employer and employee, the Business would be required to collect, and would retain, all Performance Fees paid by customers to Performer. Performer acknowledges and agrees that if the relationship were one of employer/employee, all Performance Fees would be the property of the Club. THE PARTIES ACKNOWLEDGE AND REPRESENT THAT PERFORMER'S RIGHT TO OBTAIN AND KEEP PERFORMANCE FEES PURSUANT TO THIS LICENSE IS SPECIFICALLY CONTINGENT UPON THE BUSINESS RELATIONSHIP OF THE PARTIES BEING THAT OF THE BUSINESS BEING A LICENSOR AND TEMPORARY SPACE LESSOR AND PERFORMER BEING A LICENSEE AND TEMPORARY SPACE LESSEE.**

**In order to comply with applicable tax laws and to assure that the Business is not unjustly harmed and that Performer is not unjustly enriched, the Business and Performer agree that if upon any ruling or decision of an arbitrator, court or other tribunal with jurisdiction over the matter that the relationship is one of employer/employee, Performer shall surrender, reimburse and pay to the Business, all Performance Fees received by Performer at any time she performed on the Premises – all of which would otherwise have been collected and kept by the Business had they not been retained by Performer under the terms of this License and Temporary Space Lease – and shall immediately provide a full accounting to the Business of all tip income which he/she received during that time;**

**Any Performance Fees that Performer fails to repay to the Business are deemed service charges to the customer and as such the Business shall be entitled to offset any wage obligations by any amount not returned by the Performer. This provision shall apply to any such dance fees, regardless of whether the Business makes such fees part of its gross income at the time the Performer receives such dance fees from a Business patron.**

The Business is interested only in providing temporary space under this AGREEMENT and the manner and means of performing such professional services are under the sole control of the Performer, subject to the covenants contained herein, and agreed as follows:
The benefits provided by the Business to its employees, including, but not limited to, compensation insurance and unemployment insurance *are not available from the Business to the Performer.* The Performer may present or practice services for others during those periods when he/she is not performing under this AGREMENT within the Business. The Business may, during the term of this Contract, also allow others to lease temporary space to other Performers to perform professional services for Business' patrons that the Performer herein performs, with *no right of exclusivity* directly or indirectly stated or inferred.

## ENGAGEMENT:

The Business hereby allows the professional services of the PERFORMER to occur at the Business establishment or any other location that has employed the services of the Business. The PERFORMER agrees to utilize the business premises according to the terms and conditions as agreed upon by the Business and the PERFORMER in this AGREEMENT.

## BUSINESS WILL HONOR PERFORMER'S CHOSEN LEASE SCHEDULE:

In the agreed utilization of the Business' premises herein contemplated by the PERFORMER, the PERFORMER has the sole authority to control and direct her service performances with the Business being interested only in the leasing space within the Business premises to enable the

3

PERFORMER 

PERFORMER to engage in her independent profession pursuant to this Agreement. Because of the demand on the Business' space and resources, for the benefit of all parties, a set schedule will be made available to the PERFORMER which will be honored to prevent crowding or complications caused by an overabundance of PERFORMER's. The agreed upon minimum lease period, as established through Lease Schedules, will be maintained by the parties, and the utilization of the premises, as contemplated herein shall comply with the covenants stated herein.

**MODEL RELEASE** License to use image. In further consideration for the Club or Business' grant of this license. Licensee agrees that Club or Business, or its affiliates, may use Licensee's image for the purpose of advertising her performance, the Club or Business' activities, or for any other lawful purpose, including on the internet or the Club or Business' websites.

**HOLD HARMLESS.** In further consideration to the Club for entering into this License Agreement, Performer for herself, her heirs, Personal Representatives, successors and assigns hereby covenants and agrees that neither the Club, it shareholders, officers, directors or employees shall be liable to Licensee with regard to any injury to Licensee's person or property which may occur while Licensee is on the premises of the Club, unless caused by the intentional or willful act of any of the foregoing persons. Further, Licensee agrees to inform Company immediately if she is harassed, assaulted or propositioned to commit an unlawful act by any patron, contractor, licensee or employee of Company.

## THE BUSINESS IMPOSES NO RULES OR RESTRICTIONS, BUT PERFORMER AGREES TO COMPLY WITH ALL APPLICABLE LAWS:

The PERFORMER agrees to comply with all federal, state, and municipal laws, rules and regulations pertaining to her performances and/or activities in the Business that are now or may in the future become applicable to the PERFORMER, and if she does not comply with such laws, she is solely liable for her actions and in no way, will the Business approve of such actions occurring while she is performing under the terms of this AGREEMENT. As required by governmental regulation, sexual activities and any use of controlled substances are strictly prohibited, as are any violations of other State or local laws. Any violations of these laws may result in termination of any lease or license granted by this AGREEMENT and permanent prohibition from the business premises.

PERFORMER recognizes that the Business holds one or more valuable governmental licenses, approvals, and/or permits for the conduct of business on the Premises and that such licenses, approvals, and/or permits may be the subject of actions to have such entitlements revoked, canceled, suspended or withdrawn as a result of allegations of certain illegal, immoral, or otherwise objectionable behavior on the Premises by PERFORMER or any other contracting party. PERFORMER acknowledges that the Business will experience significant economic damage and irreparable harm if such revocation, cancellation, suspension or withdrawal occurs. Accordingly, PERFORMER represents and warrants to the Business that PERFORMER has never been convicted of any crime involving moral turpitude; including, but not limited to, prostitution and PERFORMER agrees that PERFORMER shall not engage in any of the following activities on or about the Business Premises: Lewd acts; gambling; soliciting for prostitution, or engaging in prostitution; consuming alcoholic beverages if under the age of 21 years; possessing or using drugs or other illegal or controlled substances; possessing contraband or weapons; including, without limitation, knives and guns; fighting or otherwise engaging in

4

PERFORMER 

physical or verbal confrontations with any other person of any description on the Business' premises; leaving the Business Premises with any customer or patron of Business for any unlawful activity. Engaging or attempting to engage in any other conduct or activity which has the effect of causing any governmental entity to attempt the revocation, cancellation, suspension or withdrawal of licenses, permits or other governmental authorizations or approvals required by the Business to conduct business on the Premises in the ordinary and customary manner will result in termination of any lease or license granted by this AGREEMENT and permanent prohibition from the Business premises.

## INDEPENDENT NATURE OF THE RELATIONSHIP:

The Business shall engage in no conduct that would intentionally violate any state or federal wage or labor law, including but not limited to the Fair Labor Standards Act or any applicable state wage and hour or employment regulations or laws. All aspects of this AGREEMENT are also designed to protect the public health, safety, and welfare, as a basis to the use of the premises by the Temporary Space Lessee, and deemed necessary and appropriate to ensure the provisions set forth above. PERFORMER agrees to be bound by, and otherwise adhere to each and every policy and custom articulated herein by Business in connection with the Business' premises. Additionally, the following policies are agreed to by the parties:

## PERFORMER'S WARDROBE AND COSTUMES:

PERFORMER shall supply his/her own costumes and wearing apparel of any kind and nature, and the Business shall have no responsibility or liability in connection therewith. Acts and Routines are at the discretion of the PERFORMER, subject to the conduct provisions of this AGREEMENT requiring compliance with the law.

## NATURE OF PERFORMANCE:

Business shall have no right to direct or control the nature, content, character, manner, or means of PERFORMER's performance. PERFORMER acknowledges and agrees that his/her performance may include live nude, semi-nude or costumed entertainment consistent with the type of entertainment regularly legally performed at the Business premises.

## LEASE RENTAL PAYMENTS:

In exchange for the use of PERFORMER's use of the Business premises shall pay a rental lease fee as shown in the attached Exhibit, depending on variables such as time of day and saturation level of patronage. The PERFORMER must secure and reserve all requested times, which may include a minimum daily or periodic appearance, and PERFORMER agrees to perform during all hours of each shift for which she has reserved the Business' premises. The rental is due and payable on the day of each performance.

## ACKNOWLEGEMENT OF SOURCE OF PERFORMER'S INCOME:

Any and all income to be received by the PERFORMER shall be from customers directly, in the form of an "assignment" of dance fees for performances which, if the PERFORMER was an

5

PERFORMER 

employee, would be the property of the Business, and any gratuities over and above the specified dance fees. Said income will be attributed to the equivalent of earning at least "minimum wage" as required by any applicable regulation, but will not be paid directly from the Business. Business is a conduit between the performer and customer and at times an exchange in script, funny money, or gift certificates, if such policy is implemented.

## PERFORMER HAS NO EXCLUSIVITY REQUIRED:

PERFORMER is free to perform at other establishments, without restriction, provided that she adheres to the schedule reservations of performance that she has requested and agreed to perform.

## PERFORMER IS OF LAWFUL AGE:

The undersigned PERFORMER represents that he or she is of legal age, over the age of 18 (eighteen) years, and legally capable to enter in AGREEMENTS.

## RELIANCE ON LEGAL DECISIONS TO SUPPORT THE NON-EMPLOYEE RELATIONSHIP:

Both the Business and the PERFORMER rely upon the judicial decisions addressing similar Lessor/License agreements such as this one, in the decisions of *Marlar Inc. v. United States*, and *J3R, Inc. v. United States,* among other decisions, which recognize the validity of similar lease agreements as that manifest herein.

## PERFORMER IS RESPONSIBLE FOR HER OWN TAX REQUIREMENTS:

As an independent entity, the PERFORMER acknowledges that he/she is required to file his/her own federal, state and local income tax returns and is fully responsible for reporting her earnings and the payment of all income taxes due and owing on such returns.

## PERFORMER'S PROMISE TO NOTIFY BUSINESS OF DESIRE TO BE CLASSIFIED AS AN "EMPLOYEE," AND TO RETURN DANCE FEES RETAINED, IF CHANGE OF DESIGNATION IS DESIRED:

PERFORMER acknowledges and agrees, that in the event that any governing federal or state agency determines that the relationship between the Business and PERFORMER is other than that of a Business and Lessee/Licensee, PERFORMER agrees to reimburse and otherwise hold Business harmless from any and all moneys determined to be due to PERFORMER should such designation be deemed improper. If any legal action is initiated or supported by PERFORMER by any assertion that the relationship is other than that of Business and Lessee/Licensee, then, in addition to the reimbursement hereto set forth, PERFORMER shall pay to Business all additional costs and expenses incurred by Business, or any principal thereto, including actual

6

PERFORMER 

and reasonable attorney's fees in defense of any such action which PERFORMER is or becomes a party to such action. Additionally, as a "condition precedent" to any claim of "misclassification" asserted by or on behalf of the PERFORMER, the PERFORMER must demand, in writing, that she be classified and treated as an employee, prior to bringing any action pursuing any remedy for any alleged misclassification.

## ATTORNEY'S FEES:

In the event that a lawsuit or other legal services must be initiated or defended to enforce any aspect of this agreement, the prevailing party shall have a right to collect from the other party to this agreement any reasonable attorney's fees costs and/or expenses incurred in same, unless recovery of such fees are prohibited by local, state or federal law..

## AGREEMENTS OUTSIDE OF THIS AGREEMENT:

This AGREEMENT contains the complete agreement between the parties and shall, as of the effective date hereof, supersede all other agreements between the parties.

## LEGAL AUTHORITY:

The PERFORMER hereby warrants that she is of legal age and has the right to contract in her own name, that she has read this document entitled **PERFORMER LICENSE AND TEMPORARY SPACE LEASE AGREEMENT** document prior to its execution and that she is fully familiar with the contents thereof. This document shall be binding on PERFORMER and her heirs, legal representatives and assigns.

## RELEASE AND WAIVER:

PERFORMER also acknowledges that PERFORMER utilizes the Business premises under this AGREEMENT entirely upon her own risk and responsibility and in consideration of her voluntary participation in the terms and conditions of this AGREEMENT. PERFORMER does hereby for herself, her heirs, executors and administrators remise, release, and forever discharge any and all officers, agents, and employee's heirs or assigns, acting officially or otherwise, from any and all claims, demands, actions or causes of action on account of any loss or injury to PERFORMER which may occur from any cause during the term of this AGREEMENT, in the utilization of the Business premises, as well as any operations incident thereto.

## GRIEVANCE AND ARBITRATION AGREEMENT

The Business, which includes its parent corporation, affiliates, subsidiaries, divisions, successors, assigns and the current and former employees, officers, directors, and agents (hereafter collectively referred to as "the Business") seeks to work with its performers, temporary space lessees, licensees, independent contractors, and employees to resolve differences as soon as possible after they arise. Often times, differences can be eliminated through internal discussions.



To facilitate dispute resolution through open communication, we have developed a binding grievance procedure, which ultimately ends in arbitration of disputes that are not resolved through the grievance process. **Use of the Business's Grievance and Arbitration Agreement ("Agreement") binds both you, your heirs, administrators, executors, successors and assigns (hereinafter collectively referred to as "you" or "your") and the Business to grieve and arbitrate disputes, in lieu of litigating in court.**

## THE AGREEMENT TO GRIEVE AND ARBITRATE: Overview

You are required to grieve and then, if necessary, arbitrate any and all disputes, claims, or controversies ("claim") against the Business as defined above including, but not limited to, all claims arising out of your employment, the separation of employment or any other dispute, including any claim that could have been presented to or could have been brought before any court. This Agreement to grieve and then, if necessary, arbitrate includes, but is not limited to, claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964; the Fair Labor Standards Act; the Family and Medical Leave Act; the Americans with Disabilities Act of 1990; Section 1981 through 1988 of Title 42 of the United States Code; any state or local anti-discrimination laws; or any other federal, state, or local law, ordinance or regulation, or based on any public policy, contract, tort, or common law or any claim for costs, fees, or other expenses or relief, including attorney's fees. All claims which could be raised before a court must be raised by the time of the arbitration and the arbitrator shall apply the law accordingly. **As a condition precedent to arbitration, you must have exhausted all prior steps in the Business's grievance procedures, which are set forth below.**

Likewise, the Business reciprocally and in consideration of this Agreement is required to grieve and then, if necessary, arbitrate any claim against you and also agrees to be bound by the terms of this Agreement regarding any matter covered herein or any other dispute it may have with you (unless otherwise stated in a written Agreement between the parties that explicitly limits the obligations herein). Claims not covered by this Agreement are claims for workers' compensation benefits and for unemployment compensation benefits, although mention of same does not concede applicability to the relationship described herein.

## THE GRIEVANCE PROCESS

### 1. General Principals of Confidentiality Which Apply To The Grievance And Arbitration Process

To the extent consistent with adequate investigation and appropriate corrective action, all of the grievance proceedings are confidential processes, and any information relating to these proceedings may not be disclosed except as needed in the ordinary course of business. Also all arbitration proceedings will remain confidential between the parties (and arbitrator).

### 2. Grievance Procedures For Employees To Follow

    a)    **Step One**

If you feel you have a problem, you should present the situation to the manager on duty or an

8

PERFORMER 

owner. Past experience shows that most problems can be settled by simple examination and discussion of the facts.

You are not required to present the situation to the manager on duty or the owner if you do not feel comfortable discussing the situation with those individuals. Under these circumstances, you can inform the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com.

### b) Step Two

If you are dissatisfied with the manager's or your supervisor's response or you elect to bypass Step One, you may take the problem to the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com. To do this, you must complete a Dispute Resolution Form, which is available from any manager. The form requires that you set forth your grievance in writing, describing in as much detail as you can recall every act and event giving rise to your grievance, every witness and document which you believe supports your position, and the corrective measures you seek. Either a manager or the Club's attorney, Luke Lirot, will respond to your step two grievance, in writing, within ten (10) calendar days of your submission of a fully completed Dispute Resolution Form. The Business may extend this deadline by fifteen business days. The submission of a step two Dispute Resolution Form, upon receipt by the Business, postpones all limitation periods during the step two process.

The Business, in its sole and unreviewable discretion, may, in lieu of the Step Two appeal process, elect to require you to mediate your dispute. If the Business elects mediation, it must pay for all costs of the mediator and will seek to schedule the mediation within sixty (60) calendar days of submission of your Step Two Appeal Form. The mediation must occur within a seventy five mile radius of your current residence. If the Business elects mediation and it fails, you may proceed to Step Three - arbitration. The GRIEVANCE PROCESS SET FORTH ABOVE IS A CONDITON PRECEDENT TO ANY PARTICIPATION IN ARBITRATION.

### c) Step Three

If you are dissatisfied with the results of Step Two appeal and/or mediation and your claim is one to which our Arbitration Agreement below applies, you have thirty (30) calendar days from receipt of the Step Two determination to file for final and binding arbitration in accordance with this Agreement. Only claims that could be brought in a court are subject to arbitration.

## THE ARBITRATION PROCESS

The decision or award of the arbitrator shall be final and binding upon the parties. The arbitrator shall have the power to award any type of legal or equitable relief available in a court of competent jurisdiction including, but not limited to, attorney's fees, to the extent such damages are available under law. Because any arbitral award may be entered as a judgment or order in any court of competent jurisdiction, any relief or recovery to which you may be entitled upon any claim (including those arising out of employment, separation of employment, or any claim of

9

PERFORMER 

unlawful discrimination) shall be limited to that awarded by the arbitrator.

Subject to the postponement of limitation periods set forth herein, any claim for arbitration will be timely only if brought within the time in which an administrative charge or complaint would have been filed if the claim is one which could be filed with an administrative agency. If the arbitration claim raises an issue which could not have been filed with an administrative agency, then the claim must be filed within the time set by the appropriate statute of limitation.

**The parties agree that, subject to the exhaustion of the Grievance Process set forth above this Agreement is subject to binding arbitration** pursuant to the Federal Arbitration Act (the "FAA"), and any disputes under this Agreement, as well as any and all issues arising out of any State or Federal Wage and Hour or Fair Labor Standards Act issues, or any other regulatory, administrative or other issue, including any disputes that may have arisen **at any time during the relationship between the parties,** will be governed and settled by an impartial independent arbitrator appointed by the American Arbitration Association, **FLORIDA** branch, and the determination of the arbitrator shall be final and binding (except to the extent there exist grounds for vacation of an award under applicable arbitration statutes). **THE PARTIES MAY AGREE TO UTILIZE ANOTHER QUALIFIED ARBITRATION SERVICE.** The parties agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to any proceedings commenced under this Section.

**EACH PARTY SHALL BEAR ITS OWN FEES AND COSTS IN ARBITRATION, absent any legal or administrative rule to the contrary.** The arbitration provision contained herein shall be self-executing and shall remain in full force after expiration or termination of this Agreement. In the event, any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise, notwithstanding such failure to appear. The place of arbitration shall be **HILLSBOROUGH COUNTY, FLORIDA.** The arbitrator shall give effect insofar as possible to the desire of the parties hereto that the dispute or controversy be resolved in accordance with good commercial practice and the provisions of this Agreement. To the fullest extent permitted by law, the arbitrator shall apply the commercial arbitration rules of the American Arbitration Association and Title 9 of the U.S. Code, except to the extent that such rules conflict with the provisions of this Section in which event the provisions of this Section shall control, so long as allowed by law.

**THE PARTIES WAIVE ANY RIGHT TO LITIGATE SUCH CONTROVERSIES, DISPUTES, OR CLAIMS IN A COURT OF LAW, AND WAIVE THE RIGHT TO TRIAL BY JURY. ALL PARTIES SHALL HAVE THE RIGHT TO BE REPRESENTED BY LEGAL COUNSEL AT ARBITRATION. THE ARBITRATOR SHALL PERMIT REASONABLE DISCOVERY. THE PARTIES SHALL HAVE THE RIGHT TO SUBPOENA WITNESSES IN ORDER TO COMPEL THEIR ATTENDANCE AT HEARING AND TO CROSS-EXAMINE WITNESSES, AND THE ARBITRATOR'S DECISION SHALL BE IN WRITING AND SHALL CONTAIN FINDINGS OF FACT AND CONCLUSIONS OF LAW. THE ARBITRATOR'S DECISION SHALL BE FINAL, SUBJECT ONLY TO REVIEW PURSUANT TO THE FAA. THE ARBITRATOR SHALL HAVE EXCLUSIVE AUTHORITY TO RESOLVE ANY AND ALL DISPUTES OVER THE VALIDITY OF ANY PART OF THIS AGREEMENT, AND ANY AWARD BY THE ARBITRATOR MAY BE ENTERED AS A JUDGMENT IN ANY COURT HAVING JURISDICTION.**

PERFORMER

**PERFORMER UNDERSTANDS AND ACKNOWLEDGES THAT BY SIGNING THIS AGREEMENT HE/SHE SPECIFICALLY WAIVES ANY RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR COLLECTIVE ACTION AND IF AT ANY TIME PERFORMER IS DEEMED A MEMBER OF ANY CLASS CREATED BY ANY COURT IN ANY PROCEEDING, HE/SHE WILL "OPT OUT" OF SUCH CLASS AT THE FIRST OPPORTUNITY, AND SHOULD ANY THIRD PARTY PURSUE ANY CLAIMS ON HIS/HER BEHALF, PERFORMER SHALL WAIVE HIS/HER RIGHTS TO ANY SUCH MONETARY RECOVERY.**

**MISCELLANEOUS:**

This Agreement constitutes the entire understanding of the parties. No representations or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement. No prior oral or written statements, representations, promises and inducements have been made by either of the parties relating to the subject matter hereof which are not embodied in this Agreement. If any provision of this Agreement or the application thereof to any person or circumstance shall, for any reason and to the extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to the other person or circumstance shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law. The Club's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect the validity or enforceability of this Agreement or operate or be construed as a waiver of any future enforcement of that provision or any other provision of this Agreement.

The PERFORMER acknowledges that he/she has received and reviewed this document in its entirety and has received a copy of same, as evidenced by the signatures below.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT on this _____ day of _____, 20___

THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS.

**BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE THOROUGHLY REVIEWED EVERY WORD IN THIS AGREEMENT, THAT YOU HAVE HAD AN OPPORTUNITY TO PREENT THIS TO AN ATTORNEY IF ANY PART OF THIS AGREEMENT IS UNCLEAR, AND THAT YOU HAVE DONE SO OR ARE WAIVING THAT RIGHT, AND THAT YOU DO NOT NED ANY ADDITIONAL TIME TO REVIEW OR CONSIDER THIS AGREEMENT AND ARE SIGNING IT KNOWINGLY, VOLUNTARILY AND LAWFULLY:**

_____      08·6·18
PERFORMER Signature                DATE

Print Name: _____

11

PERFORMER

Witness Signature

Print Name: _____

Describe and Attach Picture ID of TSL

_____

_____
BUSINESS REPRESENTATIVE                                    DATE

Witness Signature

Print Name: _____

PERFORMER

# Grievance Form

| Administrative Information |
|---|

Name: _____ Date: _____

Agreement date: _____

Home Mailing Address: _____

Work Mailing Address: _____

Phone:_____ Email:_____

| Date, Time, and place of event leading to grievance: |
|---|
| |

| Detailed account of occurrence (include names of persons involved, if any): |
|---|
| |

| Please state policies, procedures, or guidelines that you feel have been violated: |
|---|
| |

| Proposed solution to grievance: |
| --- |
| |

The grievant should retain a copy of this form for his or her records. The signature below indicates that you are filing a grievance, and any information on this form is truthful.

_____     _____
Signature                                                                                  Date

_____     _____
Received by                                                                             Date

## Grievance Procedures To Follow

### Step one:

If you feel you have a problem, you should present the situation to the manager on duty or an owner. Past experience shows that most problems can be settled by simple examination and discussion of the facts.

You are not required to present the situation to the manager on duty or the owner if you do not feel comfortable discussing the situation with those individuals. Under these circumstances, you can inform the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com.

### Step two:

If you are dissatisfied with the manager's or your supervisor's response or you elect to bypass Step One, you may take the problem to the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com. To do this, you must complete a Dispute Resolution Form, which is available from any manager. The form requires that you set forth your grievance in writing, describing in as much detail

as you can recall every act and event giving rise to your grievance, every witness and document which you believe supports your position, and the corrective measures you seek. The Club's attorney, Luke Lirot, will respond to your step two grievance, in writing, within ten (10) calendar days of your submission of a fully completed Dispute Resolution Form. The Business may extend this deadline by fifteen business days. The submission of a step two Dispute Resolution Form, upon receipt by the Business, postpones all limitation periods during the step two process.

The Business, in its sole and unreviewable discretion, may, in lieu of the Step Two appeal process, elect to require you to mediate your dispute. If the Business elects mediation, it must pay for all costs of the mediator and will seek to schedule the mediation within sixty (60) calendar days of submission of your Step Two Appeal Form. The mediation must occur within a seventy five mile radius of your current residence. If the Business elects mediation and it fails, you may proceed to Step Three - arbitration. The GRIEVANCE PROCESS SET FORTH ABOVE IS A CONDITON PRECEDENT TO ANY PARTICIPATION IN ARBITRATION.

## Step Three:

If you are dissatisfied with the results of Step Two appeal and/or mediation and your claim is one to which our Arbitration Agreement below applies, you have thirty (30) calendar days from receipt of the Step Two determination to file for final and binding arbitration in accordance with this Agreement. Only claims that could be brought in a court are subject to arbitration.

# EXHIBIT 2

1       THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA - TAMPA DIVISION
2

3    JAMIE BURGOS,

4           Plaintiff,

5    vs.                              Case No.:
                                      8:22-CV-01171
6    ENTERTAINMENT 2851 LLC, dba
     EMPEROR'S GENTLEMEN'S CLUB fka   COLLECTIVE ACTION
7    "DIAMONDS," a Florida
     Corporation, MICHAEL TOMKOVICH,
8    an individual, DOES 1 through
     10, inclusive,
9
            Defendants.
10   _____/

11

12

13      CONTINUED VIDEOTAPED DEPOSITION OF MICHAEL TOMKOVICH
     in his personal capacity and as the representative of
14     Defendants Entertainment 2851 LLC, dba Emperor's
        Gentlemen's Club and Emperor's Tampa, Inc.
15

16               APPEARING REMOTELY FROM
               HILLSBOROUGH COUNTY, FLORIDA
17
                  Pages 1 through 76
18
             Wednesday, September 13, 2023
19              10:04 a.m. - 12:29 p.m.

20

21

22

23

24           Stenographically Reported by:
               Donna L. Peterson, RDR, CRR
25    APPEARING REMOTELY FROM SARASOTA COUNTY, FLORIDA

```
 1                      REMOTE APPEARANCES:

 2
     On Behalf of the Plaintiff:
 3
             Carpenter & Zuckerman
 4           8827 West Olympic Boulevard
             Beverly Hills, California  90211
 5           Telephone:  (310) 273-1230
             E-mail:  jturner@cz.law
 6           BY:  JUSTICE D. TURNER, ESQUIRE

 7

 8
     On Behalf of the Defendants:
 9
             Gear Law, LLC
10           1405 West Swann Ave
             Tampa, Florida  33606-2532
11           Telephone:  (904) 654-6221
             E-mail:  trescot@gearlawllc.com
12           BY:  TRESCOT J. GEAR, ESQUIRE

13

14   Also Present:

15           LeQentz Brown, videographer

16

17

18

19

20

21

22

23

24

25
```

I N D E X

WITNESS                                                    PAGE

MICHAEL TOMKOVICH

DIRECT EXAMINATION BY MR. TURNER                             5
CERTIFICATE OF OATH                                        73
CERTIFICATE OF REPORTER                                    74
ERRATA SHEET                                               75
WITNESS NOTIFICATION LETTER                                76

E X H I B I T S
(Provided electronically to the reporter and attached)

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Deposition notice | 6 |
| Exhibit 2 | Burgos application | 9 |
| Exhibit 3 | Lease agreement | 21 |
| Exhibit 4 | Liquor license for Entertainment 2851 | 26 |
| Exhibit 5 | Employee handbook | 32 |
| | (The number 6 was skipped and the number was not used) | |
| Exhibit 7 | Club policies | 42 |
| Exhibit 8 | Document titled: Entertainment 2851, LLC, Fees and Tip Policy | 53 |
| Exhibit 9 | File labeled: Entertainment 2851 Sales Breakdown 2021, 2022, part of 2023 #22 | 65 |
| Exhibit 10 | File labeled: Emperors Inc. Sales Breakdown 2021, 2022 part 2023 #22 | 67 |

1    REPORTED REMOTELY FROM SARASOTA COUNTY, FLORIDA

2         Wednesday, September 13, 2023, 10:04 a.m.

3                         -----

4         (The witness was asked by the reporter to

5    present government-issued identification, and identity

6    was verified.)

7         THE VIDEOGRAPHER:  We are now on the record.

8    This is the continued remote video-recorded

9    deposition of Michael Tomkovich.  Today is

10   Wednesday, September 13, 2023.  The time is now

11   10:04 a.m. Eastern Time, 2:05 p.m. UTC.

12        We are here in the matter of Jamie Burgos

13   versus Entertainment 2851 LLC.  My name is LeQentez

14   Brown, remote video technician on behalf of

15   U.S. Legal Support.  I am not related to any party

16   in this action, nor am I financially interested in

17   the outcome.

18        At this time will all counsel please state

19   their appearance for the record, after which the

20   witness will be sworn in.

21        MR. TURNER:  Good morning.  My name is Justice

22   Turner, appearing on behalf of plaintiff.

23        MR. GEAR:  Trescot Gear, counsel for the

24   defense.

25        THE WITNESS:  Michael Tomkovich.

1          THE REPORTER:  Sir, would you raise your right

2     hand, please, and I'll place you under oath.

3          Do you swear or affirm the testimony you are

4     about to give will be the truth, the whole truth,

5     and nothing but the truth?

6          THE WITNESS:  Yes.

7                    MICHAEL TOMKOVICH

8     having been first duly sworn, was examined and testified

9     as follows:

10                    DIRECT EXAMINATION

11    BY MR. TURNER:

12        Q.   Good morning, Mr. Tomkovich.  How are you doing

13    today?

14        A.   Okay.

15        Q.   Thank you for showing up two days in a row.  I

16    appreciate adjusting your schedule, and thank you as

17    well for helping coordinate to get those documents to

18    you.

19          As I said yesterday, my name is Justice Turner,

20    and I am the counsel for the plaintiff.  We kind of went

21    through the deposition admonitions yesterday.  Do you

22    generally remember those?

23        A.   Yes.

24        Q.   Okay.  Perfect.  So I am going to, just as a

25    brief reminder, I just state that please remember that

1   Ms. Peterson is taking down everything that we are

2   saying today.  So please speak slowly, clearly, and wait

3   for me to finish asking my questions or your attorney to

4   finish objecting before you answer your question.  Okay?

5      A.   Yes.

6      Q.   That's perfect.  We are going to pick up where

7   we left off yesterday and share my screen.

8      (Exhibit 1, remotely introduced and provided

9   electronically to the reporter, was marked for

10   identification.)

11      Q.   This will be Exhibit No. 1, just the deposition

12   notice for the deposition that we are here for today.

13      Let's see.  And yesterday you stated you had

14   seen this document, correct?

15      A.   Yes, I have seen it.

16      Q.   Okay.  Perfect.  I just want to confirm that

17   you understand that you are here in the capacity of the

18   owner of Emperor's as well as your individual capacity.

19      A.   Yes.

20      Q.   Okay.  Perfect.  And you produced some

21   documents yesterday and today, correct?

22      A.   Yes.

23      Q.   All right.  And are those all the documents

24   that are responsive to these requests?

25      A.   Yes.

1     Q.   Perfect.  Just to be clear, Mr. Tomkovich, you

2  are the owners of -- you are the owner of Emperor's?

3         MR. GEAR:  Well, object to the form.  Can you

4     be more specific as to which entity you're referring

5     to?

6         MR. TURNER:  Okay.  No problem.

7  BY MR. TURNER:

8     Q.   So when I say Emperor's, what does that mean to

9  you, Mr. Tomkovich?

10     A.   It's a fictitious name registration.

11     Q.   Okay.  And that's fictitious name for

12  Entertainment 2851 LLC?

13     A.   Yes.

14     Q.   Okay.  And are you the owner of

15  Entertainment 2851 LLC?

16     A.   Yes.

17     Q.   So you helped to create the entity known as

18  Entertainment 2851 LLC, which is also known as Emperor's

19  or Emperor's Gentlemen's Club?

20     A.   Yes.

21     Q.   And the address for Emperor's Gentlemen's Club,

22  can you tell me what that address is?

23     A.   Yeah.  2851 US Highway North, Holiday,

24  Florida.

25     Q.   Okay.  Is that also known as Emperor's Tampa?

1    A.    No.

2    Q.    Okay.  What is the entity known as Emperor's

3  Tampa or Emperor's Tampa, Inc.?

4    A.    There is a -- there is a fictitious name for

5  Emperor's Tampa.

6    Q.    Okay.

7    A.    And Emperor, Inc., is a nude club in

8  Hillsborough County Tampa, Florida.

9    Q.    Okay.  So Emperor's, Inc., is a different club

10 from the Entertainment 2851 LLC?

11   A.    Yes.

12   Q.    Okay.  Do have these -- and they don't have the

13 same address, correct?

14   A.    That's correct, yes.

15   Q.    Okay.  And what is the address for Emperor's,

16 Inc.?

17   A.    5718 East Adamo Drive, Tampa, Florida.

18   Q.    Okay.  Perfect.

19         Do you also own Emperor's, Inc.?

20   A.    Yes.

21   Q.    Are you aware of which of those entities

22 Ms. Jamie Burgos worked at?

23   A.    I found an application for her at Emperor's in

24 Holiday, Florida, which is 2851 Entertainment LLC.

25   Q.    Okay.  So it's your testimony that Ms. Burgos

1  worked at Emperor's which is the Entertainment 2851 LLC

2  entity?

3          MR. GEAR:  Objection; mischaracterizes other

4      testimony.  He just testified that he is aware of a

5      job application.

6          MR. TURNER:  You can answer.

7          MR. GEAR:  Go ahead.

8          THE WITNESS:  I did not find any records that

9      she worked there for 2851.  She filled out a job

10      application.

11 BY MR. TURNER:

12     Q.   Do you recall what year that job application

13 was for?

14     A.   It was wrote down on her application.  I don't

15 know the year.  I didn't study her application that

16 closely.

17          MR. TURNER:  No problem.  I can -- let me

18      introduce an Exhibit 2.

19          (Exhibit 2, remotely introduced and provided

20 electronically to the reporter, was marked for

21 identification.)

22          THE VIDEOGRAPHER:  Excuse me.  Mr. Tomkovich,

23      are you able to tilt your screen down just a little

24      bit?  We are kind of losing you at the bottom.

25          Thank you.

1  BY MR. TURNER:

2      Q.   Mr. Tomkovich, can you see my screen?

3      A.   Yes.

4      Q.   All right.  Is this the application that you

5  were referring to?

6      A.   Yes.

7      Q.   Okay.  And this title says "performer license

8  and temporary space lease agreement"?

9      A.   Yes.

10      Q.   All right.  So is this an application or is

11  this an agreement after she was already hired?

12      A.   This is the agreement they -- they fill out

13  before they -- they start to work.

14      Q.   Okay.  All right.  So can you walk me through

15  that process.  Does this -- is this what they fill out

16  to apply, or is there another application they fill out

17  prior to this agreement?

18      A.   No.  This is -- that's the only one.

19      Q.   Okay.  Okay.  And this was filled out, it says

20  here, on -- can you read the --

21      A.   It says June 19th, 2021.

22      Q.   Oh, down here, 2021.  Perfect.  Okay.

23      And then is your testimony that that's the

24  signature of Jamie Burgos at the bottom?

25      A.   I believe so.  I didn't take the application.

1    Q.    Okay.  Down here, there are two other

2  signatures.  Do you know this -- who these individuals

3  are?

4    A.    I don't know.  Do I have to guess?

5    Q.    No.  Please don't guess.  If you have an

6  estimate, then that would be fine, but I don't want you

7  to guess.

8          Do you know who Jeffrey M. Vitolo is?

9    A.    Yes.  That's the DJ.

10   Q.    Okay.  That's the DJ for what entity?

11   A.    For 2851.

12   Q.    Okay.

13   A.    Now I can read it.  You made it a little bit

14  bigger.  Before, it was smaller.

15   Q.    Okay.

16   A.    And looks like Rob Kowalski, that was the

17  manager at the time.

18   Q.    The manager of 2851?

19   A.    Yes.

20   Q.    And you say "at the time."  That was in June of

21  2021?

22   A.    That's correct, yes.

23   Q.    Does Rob still work for 2851?

24   A.    No.

25   Q.    Does Jeffrey still work for 2851?

1     A.   No.

2     Q.   Okay.  So in terms of 2851, when did you obtain

3 ownership?

4     A.   Soon -- oh, it was formed --

5     Q.   Well, Mr. Tomkovich, before you look at any --

6 any paperwork, do you know off the top of your head what

7 year you obtained ownership of 2851?

8     A.   Yeah, 2021.

9     Q.   Okay.  Did you have any ownership of any adult

10 entertainment venues before 2021?

11     A.   Yes.

12     Q.   Okay.  Which venues were -- did you have

13 ownership of before 2021?

14     A.   2021.  Pompano Gold Club which is Funny --

15 Funny Time, Inc.

16     Q.   Okay.

17     A.   Jacksonville Gold Club, which is White's Place,

18 Inc., which is now out of business.  Then there was

19 another Emperor's in Jacksonville, Florida.  There is a

20 Flash Dancers.  Officer's Club in Jacksonville, Florida.

21 Emperor's in Savannah, Georgia.  And then there was a --

22 Thee Manor in Clearwater, Florida.  And then there was

23 Gold Club in Tampa, Florida.  And an Emperor's in Tampa,

24 Florida.

25     Q.   Okay.  And the Emperor's in Tampa, Florida, is

1  the entity that's Emperor's, Inc.?

2      A.    Yes.

3      Q.    Okay.  And for Emperor's, Inc., which is the

4  Emperor's Club in Tampa, Florida, when did you obtain

5  ownership of that club?

6      A.    Oh, there is -- there is two Emperor's in

7  Tampa, Florida.  There is 1 and 2, one nude and one not

8  nude.

9      Q.    Okay.

10      A.    Just wanted to clarify that.

11      Q.    I appreciate that.  Are they -- what is the

12  address for the nude location?

13      A.    5718 East Adamo Drive, dash 1, I believe, or

14  maybe it's dash 2.  I don't remember exactly.

15      Q.    Okay.  And then what about the address for the

16  one that is not nude?

17      A.    5718 East Adamo Drive, Tampa, Florida.

18      Q.    So they are on the same lot?

19      A.    Yes.

20      Q.    And when did you obtain ownership -- or did you

21  obtain ownership of both the nude and non-nude at the

22  same time?

23      A.    No.

24      Q.    Okay.  When did you obtain ownership of the

25  nude Emperor's in Tampa?

1    A.    Oh, I'm trying to think.

2    Q.    Yeah.

3    A.    I think it was opened in 2007, I believe.

4    Q.    Okay.  So you were the first owner of that

5    entity?

6    A.    Yes.

7    Q.    And then what about the non-nude?

8    A.    I believe I got that in 2006.

9    Q.    Did you build both clubs?

10    A.    No.  One was an existing club, and one was a

11    build-out.

12    Q.    Okay.  So the existing club was the non-nude

13    version?

14    A.    Originally it was the nude version, and then I

15    switched the uses.

16    Q.    Okay.  So --

17    A.    One was alcohol.

18    Q.    I'm sorry.  One more time?

19    A.    One was nude with no alcohol, and the other one

20    was not nude with alcohol.

21    Q.    Okay.  And so --

22    A.    That --

23    Q.    -- in 2006 -- oh, I'm sorry.

24    A.    Okay.

25    Q.    In 2006 which club did you obtain?

1    A.    It was a nude club, and it was -- and the

2  corporate name was Emperor's, Inc.

3    Q.    And it was -- it was already there, and they

4  did not sell alcohol there, correct?

5    A.    Yes.

6    Q.    And did you immediately change it from nude to

7  non-nude?

8    A.    No.

9    Q.    Okay.  When did you make that change?

10    A.    It was several years later.

11    Q.    Okay.  But the next --

12    A.    I don't know the exact date.  I mean, I said it

13  was 2007, but I think it was a little later than that by

14  the time I started.  I think I started working on it in

15  2007.  But with the, you know, city regulation and

16  build-out, the day you start is not the day you finish.

17    Q.    Of course.  So a couple of years later, you

18  started the build-out of the nude club; and that nude

19  club became the new version?

20    A.    Yes.

21    Q.    Okay.  So sometime between 2007 and 2009 maybe?

22    A.    Yes.

23    Q.    And that nude club that was opened was also

24  under Emperor's, Inc.?

25    A.    Yes, it was under Emperor's, Inc., I believe.

1      Q.    Which one of these locations is the bigger

2  venue?

3            MR. GEAR:  Objection; form.

4            MR. TURNER:  Sorry.  I couldn't hear you,

5      Counsel.

6            MR. GEAR:  Yeah.  When you say "bigger,"

7      clarify what you mean by "bigger."  I won't have my

8      client testify to what two different versions of

9      "bigger" means.

10           MR. TURNER:  No problem.

11  BY MR. TURNER:

12     Q.    Mr. Tomkovich, did you understand my question?

13     A.    You asked which one was bigger, but I don't

14  understand what you mean by "bigger."

15     Q.    Okay.  No problem.  Which one has the -- has

16  the more physical space?

17     A.    Emperor's, Inc.

18     Q.    I mean of the non-nude or the nude version.

19     A.    The nude version is bigger.

20     Q.    Oh.  Which is the build-out, correct?

21     A.    Yes.

22     Q.    How do you generally differentiate between the

23  non-nude version and the nude version of the Emperor's,

24  Inc., clubs?

25     A.    Oh.  The one has a sign that says "Emperor's

1   fully nude" and the other one says "Emperor's."

2      Q.   Okay.   Which one of those versions has the most

3   gross sales per year?

4      A.   The Emperor's with alcohol.

5      Q.   Okay.   And the alcohol is the driving force of

6   why that one brings in more money?

7      A.   Yes.

8      Q.   Are you aware of any of the managers that

9   worked at Emperor's, Inc., either the nude or non-nude

10   version, from 2006 to the present?

11      A.   I don't even know where to start.

12      Q.   Okay.   Just any -- any names you can think of

13   would be helpful.

14      A.   Recently in the nude version was a guy named

15   Chris.

16      Q.   Do you know Chris's last name?

17      A.   No.

18      Q.   Okay.   Any other managers in the nude version?

19      A.   I don't know.   I have a guy name Adam Evans.

20      I don't know.

21      Q.   No problem.   No one else you can think of that

22   has -- is a manager at the nude version in --

23      A.   New guy, name is Shawn that is there now.

24      Q.   Okay.   All right.   Any managers that worked at

25   the non-nude versions?

1      A.    Yeah.  I had a woman named Darlene.

2      Q.    Okay.

3      A.    I had a -- I don't know.  Adam also is at

4   the -- at the alcohol version.  Adam Evans.

5      Q.    Okay.

6      A.    And other than that, I see them.  I say hello.

7   I don't really know who they are.

8      Q.    No problem.  Did most of the managers work at

9   both the non-alcohol and alcohol versions?

10     A.    No.  Totally separate.

11     Q.    Okay.  Mr. Tomkovich, how many adult

12  entertainment clubs do you currently own?

13     A.    Eight.

14     Q.    And that's throughout Florida, Georgia, and are

15  there any other states?

16     A.    No.

17     Q.    Okay.  When did you first get into the adult

18  entertainment business?

19     A.    In 1991.

20     Q.    And what was your first club?

21     A.    I still own it today.  It's -- it was, at the

22  time, Crossroads.

23     Q.    And where is that club located?

24     A.    Jacksonville, Florida.

25     Q.    And what's the current name?

1     A.    Thee Officer's Club.

2     Q.    When did you -- or can you explain to me how

3 you got involved in that club?

4     A.    I found it was for sale.  I knew the owner, and

5 I bought it.

6     Q.    Okay.  Did you have any experience working at

7 adult entertainment clubs before that?

8     A.    Not really.

9     Q.    Okay.  So what drew your interest into wanting

10 to own that particular club?

11     A.    I thought it was a good opportunity.

12     Q.    Okay.  An opportunity for income?

13     A.    Yes.

14     Q.    Do you recall who you purchased Emperor's, Inc.

15 from in 2006?

16     A.    That doesn't make sense.

17     Q.    Okay.  You stated there was an -- a nude club

18 in 2006 at the 5718 address, correct?

19     A.    Yes.

20     Q.    All right.  Did you own that club before 2006?

21     A.    No.

22     Q.    All right.  Did someone else own that club

23 before 2006?

24     A.    Yes.

25     Q.    But it was called something other than

1　Emperor's, Inc.?

2　　　A.　That's correct, yes.

3　　　Q.　Okay.　What was it called prior to 2006?

4　　　A.　I don't remember what the corporate name was.

5　I believe it was Diamonds before that.

6　　　Q.　Okay.　And when you purchased the club, you

7　changed the name to Emperor's?

8　　　A.　Yes.

9　　　Q.　And who did you purchase the club from that you

10　recall?

11　　　A.　I don't remember what the corporate name was,

12　but the owner was a guy named Jack Galardi.

13　　　Q.　Okay.　You stated previously that you have been

14　deposed -- or yesterday you stated that you had been

15　deposed at least ten times previously, correct?

16　　　A.　Yes.

17　　　Q.　In those depositions, were they civil suits or

18　criminal suits or criminal actions?

19　　　A.　Civil.

20　　　Q.　Okay.　Were all of them regarding your business

21　ventures?

22　　　A.　I don't think, not all of them.

23　　　Q.　But the majority of them were?

24　　　A.　Yes.

25　　　Q.　Have you ever been sued in an employment action

1  similar to this one?

2      A.    Yes.

3      Q.    In any of those civil actions, has the court

4  ever ruled that you were an employer?

5          MR. GEAR:  Objection; asked for -- asks for the

6      deponent to give legal testimony, --

7          MR. TURNER:  You can --

8          MR. GEAR: -- calls for legal --

9          THE WITNESS:  I don't know.

10  BY MR. TURNER:

11      Q.    Okay.  No problem.  Has a court ever ruled that

12  entertainers that work at any of your businesses are

13  employees of that business?

14          MR. GEAR:  Same objection; legal conclusion.

15          MR. TURNER:  You can answer.

16          THE WITNESS:  No, never had that happen.

17          (Exhibit 3, remotely introduced and provided

18  electronically to the reporter, was marked for

19  identification.)

20  BY MR. TURNER:

21      Q.    Okay.  I am going to mark as Exhibit 3.  I'll

22  share my screen.  This document has been produced.  It

23  says "lease agreement."

24          Can you explain what this -- this document is?

25  I will make it a little bigger for you.

1     A.   Oh, this is the lease between 2851 renting the
2   property from MDT Land Holdings.
3     Q.   And this is the Emperor's, Inc.?
4     A.   No.  Doesn't say that.
5     Q.   No.  Okay.
6          So what -- what business is located at 51 --
7   5718 East Adamo Drive?
8     A.   That's my -- where my corporate office is.
9     Q.   Okay.
10    A.   And where Emperor's, Inc. is in Tampa and the
11  Emperor's alcohol in Tampa.
12    Q.   Okay.  So this address is your corporate office
13  in Tampa, as well as the location for the Emperor's,
14  Inc. in Tampa?
15    A.   Yes.
16    Q.   And it is also the address of the MDT Land
17  Holdings?
18    A.   It's where they get the mail.
19    Q.   Okay.  So that's where they get the mail, but
20  that's not their physical address?
21    A.   That's my corporate address.
22    Q.   Okay.  Who owns MDT Land Holdings, LLC?
23    A.   I do.
24    Q.   Okay.  So this is a lease agreement from one of
25  your companies to another one of your companies?

1      A.    Yes.

2      Q.    All right.  The terms of this lease are for a

3  thousand dollars a month?

4      A.    Yes.

5      Q.    We scroll down, just to confirm.

6            The landlord and the tenant are both listed as

7  you, correct?

8      A.    I own both companies.

9      Q.    Okay.  So it is correct that you are the

10  landlord and the tenant in this agreement?

11     A.    Yes.

12     Q.    And if you can read the highlighted portion

13  really quick.  And is -- whose insurance coverage does

14  this identify?

15     A.    The insurance is for Emperor's -- I mean, for

16  2851 Entertainment.

17     Q.    Okay.

18     A.    And -- and MDT Land Holdings on the -- on the

19  property.

20     Q.    Okay.  So this is the insurance agreement for

21  both companies that are party to this agreement?

22     A.    That's not the insurance.  That's what the

23  lease says, the minimums you have to carry for

24  insurance.

25     Q.    Oh, okay.

1      A.    That is not the insurance agreement.

2      Q.    So this is the minimum amounts that the tenant

3 must carry on the premises?

4      A.    Yes.

5      Q.    Okay.  And this was signed in May of 2021?

6      A.    That's what it says; then that's what it would

7 be.  Yeah.

8      Q.    Do you know who Trudy McKean is?

9      A.    Trudy McKean, yeah, she was a secretary at the

10 time for me.

11      Q.    Does she no longer work for you?

12      A.    No, she doesn't.

13      Q.    Okay.  And then this is your signature at the

14 top?

15      A.    Yeah.

16      Q.    Okay.  And you signed on behalf of

17 Entertainment 2851?

18      A.    Yes.

19      Q.    And that says d/b/a Emperor's, because

20 Emperor's is the fictitious name for Entertainment 2851,

21 correct?

22      A.    Yes.

23      Q.    Okay.  And then are you aware of the names of

24 these two witnesses that have signed as well?

25      A.    I believe that is another secretary.  Let's

1  see.

2      Q.   Is that first name Naomi?

3      A.   Yeah.  She was a -- the HR woman.

4      Q.   Okay.  And her last name is May?

5      A.   I believe so.

6      Q.   And she no longer works for you?

7      A.   No.

8      Q.   And the second name, do you know what that name

9  is?

10     A.   I am not sure.

11     Q.   Okay.  And you said Naomi May was the HR person

12 for which entity?

13     A.   For all, for all of the entities.

14     Q.   Okay.

15     A.   She was in the corporate office.

16     Q.   Okay.

17     A.   The corporate office worked for one entity.

18     Q.   Okay.  And what entity is that?

19     A.   Billed separately.  So there is no -- there is

20 no cross between ownership and the work duties.

21     Q.   Okay.  And what -- what is that one entity?

22     A.   No.  The corporate office name?

23     Q.   Yes.

24     A.   I don't remember.  I don't remember right

25 offhand.

1    Q.    Okay.

2    A.    It's wrote down.

3    Q.    Do you have a document with you that would

4    refresh your memory?

5    A.    I could go in the other room and look.

6    Q.    Okay.  Not -- not right now, but we'll come

7    back to that.  Okay.

8          (Exhibit 4, remotely introduced and provided

9    electronically to the reporter, was marked for

10   identification.)

11   Q.    For Exhibit 4, I am going to share my screen

12   again.  And this is the liquor license for

13   Entertainment 2851, correct?

14   A.    Yes.

15   Q.    Do you have a similar liquor license for the

16   Emperor's, Inc., with alcohol?

17   A.    The Emperor's, Inc. doesn't have alcohol.

18   Q.    Well, there is -- there is one location that

19   does have alcohol, correct?

20   A.    Yes.

21   Q.    And so is that known by something different

22   than Emperor's, Inc.?

23   A.    Yes.

24   Q.    All right.  What is that name?

25   A.    EMTB LLC.

1    Q.    Okay.  So Emperor's, Inc., is the non-nude with

2 alcohol; and EMTB, LLC, is the nude with -- with

3 alcohol, or non-nude with alcohol?

4    A.    You got part of it, you got part of it right.

5    Q.    Okay.  So Emperor's, Inc., is nude with no

6 alcohol?

7    A.    Yes.

8    Q.    And then EMTB, LLC, is non-nude with alcohol?

9    A.    Yes.

10    Q.    Okay.  And they are both located at the

11 5718 East Adamo location?

12    A.    Yes.

13    Q.    All right.  So do you have a liquor license

14 like this for the EMTB, LLC, entity?

15    A.    Yes.

16        MR. TURNER:  Okay.  And, Counsel, are you able

17    to produce that today?

18        MR. GEAR:  I probably will be able to.

19        MR. TURNER:  Okay.

20 BY MR. TURNER:

21    Q.    All right.  And for the EMTB, LLC, when was

22 that entity formed?

23    A.    I don't know.

24    Q.    Okay.  But it was formed before the -- the

25 build-out of the nude Emperor's?

1      A.   I don't know.

2      Q.   Okay.  Are you the owner of that entity?

3      A.   Yes.

4      Q.   Okay.  Do you have the entity formation

5 documents?

6      A.   Yes.  But I wasn't required to produce those

7 today.

8      Q.   Okay.  No problem, no problem.  The...

9      MR. GEAR:  Yeah, Justice, you are going to have

10    to do a supplemental request for production of

11    documents relating to that separate entity which

12    wasn't covered under the initial duces tecum.

13      MR. TURNER:  Yeah.  No -- no problem.  That's

14    kind of why we are here today, because there is a

15    lot of confusion with the different entities that we

16    have going on.  So I would love to get some clarity

17    on that.  I think it actually may have been covered

18    under a couple of the requests, but I'm happy to do

19    some supplemental requests.

20 BY MR. TURNER:

21      Q.   The Emperor's, Inc., is the nude version with

22 no alcohol, correct?

23      MR. GEAR:  Objection; asked and answered.

24      MR. TURNER:  You can answer.

25      THE WITNESS:  Yes.

1  BY MR. TURNER:

2      Q.   And that was started in 2006, correct?

3           MR. GEAR:  Objection; asked and answered.  Go

4      ahead.

5      A.   That's when I think I started -- no, that

6  wasn't -- that's not correct.

7      Q.   Okay.  So when was Emperor's, Inc., started?

8      A.   2006.

9      Q.   Okay.  And that's also when you purchased the

10  club that was on 5718 East Adamo, right?

11     A.   Yes.

12     Q.   Do you recall if EMTB, LLC, was formed before

13  or after the build-out began?

14     A.   It was formed after, I believe.  I have had

15  several -- I can clarify this a little quicker.  I have

16  had several entity creations and gone through some

17  changes at that 5718 location.

18     Q.   Well, let's go through those, those entity

19  creations at -- at 5718.  Since 2006 how many entities

20  have been created or have been located at the 5718 East

21  Adamo location?

22     A.   I don't know.  I was not prepared for that

23  today.

24     Q.   Excuse me?

25     A.   I wasn't prepared for that today.  I don't

1  know.

2      Q.    No problem.  What -- do you remember -- do you

3  recall any of the names of the entities at that

4  location?

5      A.    I -- I would be guessing.  No.  Just right this

6  second, I don't think guessing is the correct thing to

7  do.

8      Q.    Okay.  No problem.  But you know there were at

9  least three entities who were formed and had the East

10 Adamo as their address, correct?

11     A.    I guess so, yes.

12     Q.    Okay.  Now, you stated there have been multiple

13 entities that you have created or formed at that

14 address?

15         MR. GEAR:  Objection; form.  Can you restate

16     the question?

17     Q.    Have more than three of the entities that you

18 have formed had their address at 5718 East Adamo?

19     A.    Yes.

20     Q.    Okay.  And many of those businesses involve

21 adult entertainment?

22     A.    I don't know if I'd say "many," but some do.

23     Q.    Okay.  More than two?

24     A.    Yes.

25     Q.    Okay.  Do you know if Ms. Burgos worked at the

1  nude or non-nude club at 5718 East Adamo?

2  A.  I haven't looked for any of those records.  I

3  don't know the answer to that question.

4  Q.  Okay.  Is there any particular reason you did

5  not look for those records?

6  A.  Yes.  Because I am being sued at

7  2851 Entertainment LLC in Holiday, Florida.  So that's

8  where the -- this case is originated from.  And I have

9  an application for Ms. Burgos and went through the

10  records and never found her working up there.  We do

11  have an application that she filled out and went up

12  there.

13  Q.  Are you aware that you are also being sued for

14  Emperor's in Tampa?

15  A.  No.

16  Q.  Okay.  So you were not aware that you were --

17  your lawsuit is also against the Emperor's, Inc.,

18  located at 5718 East Adamo?

19  A.  No.

20  Q.  Okay.  I want to...

21  Go back to Exhibit 1.  And highlight on page,

22  let's see, six.  "'Emperor's' means and refers to you,

23  'Emperor's Tampa,' and the club owned and operated at

24  5718 East Adamo Drive."

25  Did you see this?

1     A.   Let's see.  I don't have the clarification of

2   that.  I only looked at was, at the top, there was being

3   sued is 2851 Entertainment Emperor's.

4     Q.   Okay.  But you understand that all of these

5   requests for production include the clubs located at

6   that address, all of these, to produce documents?

7     A.   I can't -- I understood that to mean

8   2851 Entertainment.

9        MR. TURNER:  Okay.  We have been going for

10       about 50 minutes.  If we can go off the record,

11       please.

12       THE VIDEOGRAPHER:  The time is 10:49 a.m.  We

13       are going off the record.

14       (Recess from 10:49 a.m. until 11:02 a.m.)

15       THE VIDEOGRAPHER:  The time is 11:02 a.m.

16   We're back on the record.

17   BY MR. TURNER:

18     Q.   Good morning, Mr. Tomkovich.  I want to

19   introduce my next exhibit.  I think this is Exhibit 5, I

20   believe.  Let me share my screen.

21       (Exhibit 5, remotely introduced and provided

22   electronically to the reporter, was marked for

23   identification.)

24     Q.   This is a document you produced as the employee

25   handbook.

1          Have you seen this document before?

2     A.   Yes.

3     Q.   And which employees is this handbook for?

4     A.   For 2851.

5     Q.   Okay.  And does that include the adult

6   entertainment dancers?

7     A.   No.

8     Q.   Okay.  So this is strictly for individuals that

9   you consider employees, but not the -- the dancers at

10  any of the clubs under Entertainment 2851, correct?

11    A.   Correct.

12    Q.   Okay.  Is this handed out to all of those

13  employees?

14    A.   They have a chance to read it.  If they want a

15  copy, one is produced for them.  Most of them just read

16  it, and it's just on file in the -- in the office at the

17  club.

18    Q.   Okay.

19    A.   And where they get their paychecks, they can

20  also contact Kymberly Group --

21    Q.   Okay.

22    A.   -- Inc., get a copy of it.

23    Q.   Is this made available for the independent

24  dancers as well?

25    A.   I never had a need to show it to them.  The

1   policies for sexual harassment and things this nature

2   are broad. They do cover them also.

3      Q.   Okay. Are they allowed to -- do they have

4   access to this, this document?

5      A.   If they ask it's -- it's -- I wouldn't say

6   public record. But if you go into the office and ask to

7   see a document with, you know, the other type of state

8   law and things, documents on the wall, it would be

9   accessible.

10      Q.   Okay. At the clubs under Entertainment 2851

11   and the Emperor's, Inc., as well as EMTB, LLC, are the

12   dancers at all entities treated as independent

13   contractors?

14      A.   Now I have to ask you a question back. What

15   time frames are you -- are you talking about? In 1991

16   when I started or today in 2023?

17      Q.   I'll clarify. For -- for all of those entities

18   that I just mentioned, from 2000 to 2021 were all

19   dancers treated as independent contractors?

20         MR. GEAR:  Objection; unduly broad.

21         MR. TURNER:  You can answer.

22         THE WITNESS:  That's hard to answer. I'll try

23    my best.

24         MR. TURNER:  Okay.

25         THE WITNESS:  I was operating under the

1    assumption that they were independent contractors.

2    I had a Federal Department of Labor audit, not due

3    to dancers, but to regular employees.  And the

4    Federal Department of Labor in Jacksonville,

5    Florida, where it started, said they did not

6    consider dancers -- all you had to do to comply with

7    the Federal Department of Labor, as -- as behest to

8    my companies, was to just keep a record and make

9    sure that the dancers made minimum wage.  I operated

10   under that assertion for many years and never had a

11   reason to change it.

12       Then I had a labor audit for a regular bar and

13   nightclub, and the Federal Department of Labor got

14   involved in that, and they went to my other

15   entities.  And they upheld the same federal

16   agreement I had with the Jacksonville Federal

17   Department of Labor.

18       As things have progressed with the lawsuits

19   now, I have changed the policies, and they are now

20   considered a commission-based employee, where --

21   that's where I'm at today.

22   BY MR. TURNER:

23       Q.   Okay.  And so can I get some years of those two

24   federal audits?

25       A.   I was trying to track down the exact years, so

1  now this will be a guesstimation because I wasn't able

2  to do that that quickly.

3      Q.    Give me a range if that's an easier estimate.

4      A.    That, that, okay, as long as we're dealing with

5  that.  The range started -- when did I buy in?  In two

6  thousand -- I think the first audit was 2008, and then

7  another one about three years later, probably 2011.

8  That would have been the one in Tampa that still was

9  agreeing with the Federal Department of Labor in

10  Jacksonville, Florida; that dancers weren't considered

11  employees, they were independent contractors.  And as

12  long as I made sure they made minimum wage, they did not

13  want to get involved with any dancer stuff, period.  So

14  that went up to probably 2012.

15          And then the first suit I've ever had with this

16  was, I think -- I never had any kind of monetary moneys

17  out -- was somewhere around 2020 with an attorney

18  Kristensen, which I believe is in your firm, so that

19  would have been 2020.

20      Q.    And when did you believe -- or when did you

21  transition your entertainers to commission-based

22  employees?

23      A.    Somewhere around '18.

24      Q.    Around 2018?

25      A.    Yes.  Then the pandemic happened at the end of

1  '19, so.  I think it's '18 or '17, right in there, is

2  when we went to more of a commission-based employee

3  than a -- than a true independent contractor.

4      Q.   And do you have any of the paperwork for

5  Jamie Burgos that states that she is a commission-based

6  employee?

7      A.   No.

8      Q.   Okay.  And can you tell me why that is?

9      A.   All I had was her application for 2851, and

10 that's all I found on her.

11     Q.   Okay.  And that, we went over that one.  That

12 is signed in 2021, correct?

13     A.   Yes.

14     Q.   So somewhere in that document, it should say

15 that she is a commissioned-based employee?

16     A.   Not in that document, because that was a

17 start-up place.  It opened in June of 2021.  So all of

18 the documents that we use, that my -- some of my other

19 locations had not been, like, gone through and approved

20 by the attorney and looked at.

21     Q.   Okay.  But you -- you said you transitioned

22 your dancers to commission-based employees in 2017,

23 2018, correct?

24     A.   Yes, but that -- all the -- all -- I'm not a

25 great lawyer.  I don't have every piece of paper.

1    What started happening is we collected the

2  money from the customer and handed it back to the girl,

3  and gave them a piece of paper, showed that they made

4  that money for the night; put it on another piece of

5  paper and showed that they made -- they came in at, say,

6  8:00 o'clock at night, they left at 1:30, six hours of

7  work.  They made X.  Here you go, sign for this that you

8  made money, and leave.

9    Q.   Okay.  During this relationship --

10   A.   Now, are all these pieces of paper --

11        MR. GEAR:  Hold on for Mr. Turner.

12        MR. TURNER:  Sorry.  I didn't catch that.  What

13   did you say?

14        THE WITNESS:  No, nothing.

15        MR. TURNER:  Okay.

16        THE WITNESS:  I was interrupting you.

17  BY MR. TURNER:

18   Q.   Did those pieces of paper that you had the

19  entertainer sign, did you have any process of keeping

20  those?

21   A.   I don't have them personally.

22   Q.   Okay.  Who would have those documents?

23   A.   We'd have to look through boxes.  I don't --

24  I'm not involved in the -- see, this is where this gets

25  a little dicey for all of us.  I am not -- I do not

1  handle the documents.  I do not walk into these places
2  on a regular basis.
3      Q.   Okay.
4      A.   I have been in federal court before for images
5  case.  I'll give you a great synopsis of how -- how it
6  was explained to the federal judge in that.  I am the
7  guy to get 30,000 feet just overseeing this.  But to the
8  day-to-day, every piece of paper, do I touch it?  Do I
9  expect it to be done?  Yes.  Do I touch it?  No.
10     Q.   Right.  And I -- I definitely understand that.
11         My -- my issue that I'm having is that since
12 you don't touch it, I need the names of the individuals
13 who do.  And you haven't been able to produce those,
14 those names for me.  So since you are the owner, I have
15 to get that information from you.  So --
16     A.   Correct.
17     Q.   -- do you know who -- who would be able to
18 produce those documents with that information?
19     A.   I -- I can't put -- I don't know.
20     Q.   Okay.  No problem.
21         I'll bring back up the agreement, which I
22 believe was Exhibit 3 or 4.  Let me share my screen.
23         This is the agreement with Jamie Burgos.  And
24 it says right here on -- let me see where, which page
25 this is.

1        Page 3, the agreement, "The performer is a

2    self-employed independent entity."

3        Do you see that?

4    A.    Yes.

5    Q.    Okay.  "In the performers independently

6    established -- employ -- independently established

7    business, and performer elects not to be classified as

8    an employee."  (As read)

9        Was this still the way you classified

10   entertainers in 2021?

11   A.    I don't know when -- when the change in the

12   paperwork happened or -- or this; so I'll leave it as I

13   don't know.

14   Q.    Okay.  But the agreement states that it is in

15   June 19th of 2021, correct?

16   A.    Yes.

17   Q.    Okay.  And this is for an entity that you

18   owned, correct?

19   A.    Yes.

20   Q.    So in June 2021, at entity that you owned,

21   dancers were still signing agreements where they were

22   classified as independent contractors, correct?

23       MR. GEAR:  Objection; mischaracterizes earlier

24       testimony.

25       MR. TURNER:  You can answer.

1          THE WITNESS:  I don't know the answer to that
2     question.
3  BY MR. TURNER:
4          Q.   Well, the document is -- is right in front of
5  you.  So I just want to clarify that in 2021,
6  entertainers, including Ms. Burgos, still signed an
7  agreement that stated that she performed as an
8  independent contractor and not as an employee, correct?
9          A.   I still don't know the answer to that question.
10         Q.   Okay.  So just to be clear, I want to make sure
11  this is visible for you.
12          You're telling me you don't understand the
13  document in front of you that says that in June of 2021
14  Jamie Burgos is performing as an independent contractor
15  and not as an employee?
16         A.   I don't have any documents that show she
17  actually ever worked there, so that's -- my answer is
18  still going to be I don't know.
19         Q.   Okay.  All right.  But she -- she definitely
20  signed this agreement that says she agrees to work as an
21  employee -- I mean, as an independent contractor and not
22  an employee, in June of 2021?
23         A.   If that's what -- that's what it says, yes.
24         Q.   Okay.  And I have the next exhibit, which I
25  believe would be Exhibit 7.

1        (At this time the reporter lost the internet

2    connection at 11:16 a.m.; then telephoned into the

3    Zoom meeting and advised all counsel and the

4    videographer.  The videographer went off the record

5    at 11:19.)

6        (Recess from 11:16 a.m. until 11:31 a.m.)

7        THE REPORTER:  I will read back the last

8    question I had.

9        Question:  "Okay.  And I have the next exhibit,

10    which I believe would be Exhibit 7."

11        MR. TURNER:  Okay.  And I just want to confirm,

12    Trescot, your memory is the same as mine that the

13    last exhibit I was talking about was the club

14    policies.

15        MR. GEAR:  Yes, Exhibit 7, correct.

16        MR. TURNER:  Okay.  Perfect.  All right.

17        (Exhibit 7, remotely introduced and provided

18  electronically to the reporter, was marked for

19  identification.)

20        MR. TURNER:  So I am going to share my screen

21    with Exhibit 7.  And then whenever we go back on

22    record, I can start from there.

23        THE VIDEOGRAPHER:  All right.  Give me one

24    moment.  The time is 11:37 a.m., and we are back on

25    the record.

1    BY MR. TURNER:

2        Q.   Mr. Tomkovich, I am showing you exhibit -- what

3    I believe is Exhibit 7, club policies for employees.

4            We talked about this, but we lost our court

5    reporter.

6            So if you could explain, what club is this club

7    policies for, this document?

8        A.   It's for 2851 Entertainment LLC, Emperor's.

9        Q.   Okay.  And in this, you said this is only for

10   employees, correct?

11       A.   Yes.

12       Q.   And do you know what time period this document

13   covers?

14       A.   I believe it covered the time that we're

15   talking about for the Burgos case.

16       Q.   Okay.  So it was in effect from 2019 till about

17   2021?

18       A.   No.  We're -- we opened in '21.

19       Q.   Okay.

20       A.   I think June '21.

21       Q.   Okay.  And I see down here, it says that

22   employees, including independent professional

23   entertainers.

24            So at this time is it your testimony that

25   independent professional entertainers was the dancers?

1    A.    I only see pieces of paper.

2          Okay.  Where are we at?

3          Yes, it could -- it could be -- parts of it

4    could be used for that.

5    Q.    Okay.  Well, my question is:  Independent

6    professional entertainers, is that dancers?

7    A.    It can be dancers.  I have hired dancers to

8    perform, you know, special events.

9    Q.    Okay.

10   A.    There are not --

11   Q.    Those are --

12   A.    They're club dancers.

13         See, this is where -- this is where all of our

14   terminologies get a little convoluted.

15   Q.    Okay.  Does this mean that the exotic dancers

16   at your club are considered employees at this time?

17   A.    I hire feature entertainers to do it, so some

18   of this would apply to them.

19   Q.    Okay.  But not to the actual exotic dancers

20   that perform regularly?

21   A.    Right.  I mean, there -- I'm not going to tell

22   an exotic dancer to carry a note pad and a cigarette

23   lighter and a pen light and her name tag.  These --

24   this --

25   Q.    So --

1    A.    This is a broad policy, you know.  And then

2  cell phones, you know.  It used to be that a lot of this

3  was probably put together before all that was a big -- a

4  bigger deal than it is today.

5    Q.    Okay.  No problem.

6          Okay.  Are you aware, Mr. Tomkovich, if Jamie

7  Burgos worked for any of your other clubs outside of

8  Entertainment 2851?

9    A.    I don't know.

10   Q.    Okay.  All right.  Who would have the

11 documentation on if she worked for any of your other

12 clubs?

13   A.    I don't have a good answer right now.  I don't

14 know.

15   Q.    Okay.  You stated in 2018 or 2017, you

16 transitioned the entertainers to become commission-based

17 employees, correct?

18   A.    I was preparing to do that.  It did not happen

19 then.  As you prepare for something, we said:  "Okay,

20 we're going to go forward with this.  Now, how do we do

21 it correctly?"

22          So it's taken some time.  And a new POS system

23 that I have not ordered yet, but I have looked at, to

24 organize this better so this won't happen to me any

25 longer.

1     Q.   Okay.  So the -- the process began in 2017,

2  2018, but it hasn't actually happened yet?

3     A.   To come to complete fruition, no, it has not.

4     Q.   Okay.

5     A.   But the pieces of the puzzle that's missing is

6  the tracking with the POS system.  And with the pandemic

7  happening, it put everything on hold for quite a bit of

8  time.

9     Q.   Okay.  So all of the entertainers are still

10  technically independent contractors, correct?

11     A.   No.

12     Q.   Okay.  What -- what are they classified as

13  currently?

14     A.   Right now the commission-based employees.  But

15  I'm still doing this with paper and -- and not everyone

16  is transitioning correctly.

17         In 2851, they hardly have any dancers, if they

18  have any at all sometimes.

19     Q.   Okay.  But there are some dancers at some of

20  your clubs that are still treated as independent

21  contractors?

22     A.   I'd have -- I don't have a good answer for

23  that.

24     Q.   Okay.  No problem.

25         Do any of the dancers at any of your clubs have

1    paperwork that show that they are commission-based

2    employees?

3        A.   I don't have an answer for that either.

4        Q.   Okay.  So you didn't provide any information

5    today that shows that any of your -- any of the dancers

6    at any of your clubs are commission-based employees?

7        A.   That's correct.

8        Q.   Okay.  Are there any policies or procedures for

9    the dancers at any of your clubs?

10       A.   I don't understand what -- what you mean by

11   that.

12       Q.   Okay.  No problem.

13            Let me...

14            I'm going to pull back up Exhibit 7.  Can you

15   see my screen?

16       A.   Yeah.

17       Q.   Okay.  We are here, this policy that is a part

18   of the club policies.

19            "We do not condone dating fellow employees,

20   including professional entertainers."

21            Does that mean, does that include the dancers

22   that work at your clubs regularly?

23       A.   If I have an employee dating a dancer, yes,

24   that that's -- that's not condoned.

25       Q.   Okay.  So you would not condone any -- a dancer

1  dating an employee?

2     A.    I do not condone that, no.

3     Q.    No problem.

4           Okay.  And your sexual harassment policy

5  includes dancers?

6     A.    Well --

7           MR. GEAR:  Objection; form.  Can you restate --

8     restate the question?

9     Q.    Mr. Tomkovich, did you -- did you understand my

10 question?

11    A.    About a sexual harassment policy?

12    Q.    Yes.

13    A.    We have a policy for the employees, you know,

14 under federal law, under state laws, about sexual

15 harassment.  It is not my policy.  It is a government

16 policy.

17    Q.    Does that policy cover dancers as well?

18    A.    It -- it would cover even employees, dancers,

19 and customers.  No one should be harassed.  No one

20 should be denigrated by no standard.  And I don't

21 condone that at all, so.  But that's a policy.  It's a

22 policy.  That is my belief.

23    Q.    Okay.  This policy regarding the illicit or

24 illegal drugs, does that covers dancers as well?

25    A.    That covers the whole population of the state

1  of Florida and thereabouts, where the club is located.

2      Q.    Well, this is specifically speaking with

3  termination, so this is not based on --

4      A.    This -- this is -- this is back to legal

5  interpretations of -- if you're doing something illegal,

6  we have the right to bar service to anyone, and we can

7  ask anyone to leave the premises.  You can't fire

8  someone that is not an employee, but we can actually

9  let -- have them escorted and leave the premises if

10  they're doing illegal activities.

11      Q.    And when you say people that --

12      A.    Yeah.

13      Q.    -- are not employee --

14      MR. GEAR:  Don't interrupt.

15      A.    Sorry about that.

16      Q.    No problem.  I couldn't hear what you said,

17  though.  What did you say?  Can you repeat that for me?

18      A.    Oh.  I don't condone any kind of drug use.

19  Even though pot has become almost legal everywhere, I

20  still don't condone that either.  So.

21      And then the government and the State of

22  Florida does not condone having pot smoking in any kind

23  of establishments.  So I'm only able to enforce what the

24  government has already put in place that it has to

25  enforce for a safe premises.

1    Q.   I understand.  My -- my question was a little

2  different, though.

3         I was asking in terms of the termination.  Does

4  this include dancers?  Will dancers be terminated if

5  they are caught consuming, carrying, distributing, or

6  selling any type of illicit or illegal drugs?

7    A.   They will be banned from the building and not

8  be able to come back.

9    Q.   Okay.  Well, you're saying they won't be

10  terminated because they're not employees?

11    A.   That is correct.

12    Q.   Okay.  So I guess to my earlier question, you

13  stated that dancers are employ -- or commission-based

14  employees.  But now you're stating that they are

15  actually not employees, they are independent

16  contractors.

17    A.   This is more of a legal question, and I don't

18  have a good legal answer for that.

19    Q.   Okay.  I'm not asking for a legal answer.  I'm

20  just asking for what is your consideration of the

21  dancers that work at your clubs.

22    A.   Back to my answer just then, that you're asking

23  me for a legal determination on -- on stuff that we're

24  still litigating.

25    Q.   Well, no.  I'm asking you for your

1  consideration.  I'm not asking for a legal answer.

2       I'm just asking for your -- what is your

3  opinion on the dancers that work at your clubs?  Are

4  they independent contractors or are they employees?

5       A.   I don't have an opinion at this point.

6       Q.   Okay.  No problem.

7       You stated earlier in our deposition that you

8  had the dancers sign pieces of paper that explain how

9  much they got paid.  Did you produce any of those signed

10 piece of papers for Mrs. Burgos?

11      A.   I cannot find any that she worked at 2851

12 except an application that was filled out.  There is no

13 records of her actually ever working at Emperor's that

14 is being sued.

15      Q.   Well --

16      A.   I can't produce records that I don't have.

17      Q.   Okay.  Well, you are aware that -- you are

18 aware now that the Emperor's that's being sued is also

19 Emperor's, Inc., located on Adamo Drive, correct?

20      A.   Correct.

21      Q.   Okay.  So you have no documents that Ms. Burgos

22 work there either?

23      A.   That is correct.  I have no records that she

24 worked.

25      Q.   Have you looked for those records?

1     A.   I --

2        MR. GEAR:  Objection; asked and answered.  He

3     said -- he says those are documents, Justice.

4     He's --

5        MR. TURNER:  Yeah, I asked if he has looked for

6     those, those records.

7        THE WITNESS:  I personally have not looked for

8     those records.

9  BY MR. TURNER:

10     Q.   Okay.  So you personally do not know if there

11  are any records regarding whether Ms. Burgos worked at

12  either of the clubs on Adamo Drive, correct?

13     A.   Correct.

14     Q.   Okay.  For the pieces of paper that employees

15  would sign, have you produced any of the -- those

16  documents for any of the dancers that have worked at

17  either of the clubs we're discussing?

18     A.   No.  We didn't have any records at 2851.

19     Q.   Okay.  And again, you haven't looked for the

20  ones at Adamo Drive, correct?

21     A.   For Emperor's, Inc.?  No, I did not.

22     Q.   Or for EMTB, LLC?

23     A.   No, I didn't look for any for EMTB.

24     Q.   Okay.  You stated that there were documents,

25  however, that the dancers signed regarding the amount of

1  money they made each night, correct?

2      A.   Correct.

3      Q.   Were those -- was that money that they made,

4  the tips from customers?

5      A.   No.

6      Q.   Okay.  Where did that money come from?

7      A.   It comes from -- from customers that rented

8  room space, and that would be the commission.  The girl

9  did --

10     Q.   Okay.

11     A.   It gets rung into the cash register, and then

12 the money is handed back to the girl.

13     Q.   Okay.  So the customers come in and rent a room

14 and pay that money to the club, correct?

15     A.   Yes.

16     Q.   The club puts that money in the cash register

17 and then gives the dancer a percentage of that?

18     A.   Yes.

19     Q.   Okay.  And you said you don't consider that a

20 tip to the dancer, correct?

21     A.   Absolutely not.

22          (Exhibit 8, remotely introduced and provided

23 electronically to the reporter, was marked for

24 identification.)

25     Q.   Okay.  I am going to share Exhibit 8, another

```
1    of the documents produced by you and your attorneys.
2    This is titled "Entertainment 2851, LLC, Fees and Tip
3    Policy."  Do you see that?
4         A.   Yes.
5         Q.   Do you need me to make it bigger?
6         A.   Yeah, I can see it pretty good.
7         Q.   Okay.  Perfect.
8              So this is the fee and tip policy as to the
9    dancers that worked for the entity Entertainment 2851,
10   LLC, correct?
11        A.   Yes.
12        Q.   All right.  Are these policies set by the
13   dancers?
14        A.   No.
15        Q.   Who sets these policies?
16        A.   The club sets a standard policy for -- for
17   charges to customers.
18        Q.   And by "the club," is that you or who?  Who
19   sets this?
20        A.   Myself maybe or -- or the manager.  And he
21   checks in the area what other clubs are doing so the
22   price is basically in line with everyone else.
23        Q.   Okay.  And these breakdowns show that, for
24   example, for the VIP room, a single dance cost is $25
25   and the club receives $5 and entertainer receives $20,
```

1  correct?

2      A.   Yes.

3      Q.   Okay.  So when a dancer takes a customer to a

4  VIP room, the payment that the dancer receives is that

5  $20, correct?

6      A.   Yes, from -- from -- from the establishment.

7  The customer pays the money to the establishment, and

8  the establishment hands back the $20 to the girl.

9      Q.   Okay.  So they just -- they take and hold the

10  money, and then they hand it back to -- to the dancer?

11      A.   Yes.  Not hold it.  Ring it in.  And that's the

12  commission after it's rung in.

13      Q.   And the same thing for the champagne room?

14      A.   Yes.

15      Q.   And for the champagne room, there is 15-minute,

16  30-minute, and 60-minutes increments, correct?

17      A.   Yes.

18      Q.   And the prices from those increments for

19  15 minutes is 150 as the fee, for 30 minutes is 225, and

20  for 60 minutes is 400 dollars?

21      A.   Yes.   That's -- that's the -- the minimum.

22      Q.   Okay.  And the establishment receives out of

23  those, it's $25 for 15 minutes, $50 for 30 minutes, and

24  $100 for 60 minutes, correct?

25      A.   Yes.

1      Q.   And the difference goes to the entertainer?

2      A.   Yes.

3      Q.   Okay.

4      A.   And the entertainer theoretically could get, also, more tips from the customer, but the club has nothing to do with any kind of extra money.  We just charge the customer for the room rental and that's it.  Not -- no -- no charge to the dancer.

9      Q.   Right.  The dance fee is what the charge is for, though, correct?

11     A.   To the customer.

12     Q.   Right.  Okay.  And the -- the -- these prices are the minimums that the dancer must charge, correct?

14     A.   This -- excuse me?  I just said, the dancer does not charge that money.

16     Q.   Oh.  This is the minimum that the customer must pay?

18     A.   To the -- to the club, yes.

19     Q.   Okay.  And do the dancers have any input on if that minimum is increased or decreased?

21     A.   No.

22     Q.   Down here you state that there is no mandatory tip policy, correct?

24     A.   That is correct, yes.

25     Q.   Are you aware of dancers tipping DJs,

1  bartenders, or servers?

2      A.   We're in the hospitality industry.  I imagine

3  that does happen.

4      Q.   Okay.  Do the dancers decide whether or what

5  time the clubs open or close?

6      A.   No.  The governing laws of the State of Florida

7  have my hours of operation.

8      Q.   Okay.  But you can keep the club -- you can

9  close the club early, correct?

10      A.   Yes, I guess I could.

11      Q.   And dancers wouldn't have any input on that?

12      A.   I guess if they wanted to work and stay, we'll

13  stay open late.  I -- probably we could do that, too.

14      Q.   But they can't tell you that the club is going

15  to stay open late?

16      A.   I guess they could tell me.

17      Q.   But you would not have to abide by that?

18      A.   I've never had that situation, so I can't

19  answer a situation I've never had happen.

20      Q.   Okay.  Do the dancers have the authority to

21  tell you to keep the club open when you want the club to

22  close?

23      A.   I have never experienced anything like that.

24      Q.   Okay.  But in a hypothetical situation, if the

25  dancers were to tell you, "We want to keep the club

1  open," and you want the club to close, do they have the
2  authority to overrule you?
3       MR. GEAR:  We'll object to the line of
4       hypothetical questioning.
5       But, Mike, you can answer in a hypothetical
6       situation, not relevant to the case what you --
7  A.   No, not relevant to this.  If I had a whole
8  bunch of dancers wanting to stay, obviously there would
9  be customers that want to stay, and I would like to make
10 money, and I would stay open.
11 Q.   But if you did not want to keep the club open,
12 would the dancers have the authority to overrule you?
13      MR. GEAR:  Well, object to the hypothetical
14      line of questioning but -- not relevant to the case.
15      But you can answer, Mike.
16 A.   If I had a whole bunch of people willing to
17 stay open, and we had customers, because obviously there
18 would be customers to be there to make that happen, I
19 would stay open.
20 Q.   That's -- that's not my -- my question.
21      My question is:  If the dancers wanted to stay
22 open and you did not want to stay open, would they have
23 the authority to overrule you?
24 A.   Well, hypothetically, I don't go out at
25 nighttime, so hypothetically I don't have an answer to

1  the question.

2      Q.   Okay.  That's understandable.

3           Do the dancers directly pay for the bills at

4  any of the clubs?

5      A.   No.

6      Q.   Okay.  Do they pay a lease or the mortgage at

7  any of the clubs?

8      A.   No.

9      Q.   Do the dancers pay the income of any of the

10 other employees?

11     A.   No.

12     Q.   Do you file taxes on behalf of the dancers?

13     A.   No.

14     Q.   This is at any of the clubs, correct?

15     A.   I don't know.

16     Q.   Okay.  What was the process for recording when

17 dancers worked at your clubs?

18     A.   I don't understand.  My clubs.  I don't know

19 which ones, what you are talking about, and what kind of

20 policy you're asking about.

21     Q.   We'll stop -- we'll start with

22 Entertainment 2851, Emperor's.  At that club from 2021

23 to 2022, was there any policy regarding recordkeeping or

24 documenting when an entertainer worked?

25     A.   They come in, and I -- I --

1          Now I'm guessing.

2          What they do and what it is are two different

3    things.

4      Q.   Okay.  Do you know what the policy is?

5      A.   They are supposed to come in.  When they come

6    in, they sign in, what time they get there, ready for

7    work.  Then we make sure that they make minimum wage,

8    the time that they are there on the sheet, the sign-in

9    sheet.  And that's it.

10     Q.   Okay.  So they sign in, and then they sign out

11   when they leave, and you make sure that the money they

12   leave with is enough for minimum wage?

13     A.   Yes.

14     Q.   And that money comes from the customers to the

15   club, and the club gives it to the dancers, right?

16     A.   Yes.

17     Q.   Okay.  Who makes sure that the entertainers

18   sign in and sign out?

19     A.   They could be the door girl, whoever they see

20   when they first walk in, the door guy, or it could be

21   the manager or it would be the DJ.

22     Q.   Okay.  And where do those sign-in or sign-out

23   sheets go after the night is over?

24     A.   They should go to the office.

25     Q.   Okay.  And then what does the office do with

1  those records?

2      A.   They put them in a box.

3      Q.   And does each box stay at the location?

4      A.   Yes.

5      Q.   And how long is each box preserved?

6      A.   That, about a year or so.  Maybe.  Maybe

7  longer.  I don't know the exact time.

8      Q.   Okay.  And who has access to these records?

9      A.   Well, the manager that's putting them in the

10  box, and then the corporate office people after the box

11  ever makes it to the office.

12      Q.   Okay.  At Entertainment 2851, Emperor's, from

13  2021 to 2022, who were the managers at that location?

14      A.   A Rob Kowalski.  And then I had a -- oh, what

15  was her name?  Darlene Kowalski.

16      Q.   Any other managers?

17      A.   No.

18      Q.   Okay.  So only those two were the managers at

19  Entertainment 2851?

20      A.   Yeah.  If they had a swing shift manager, I

21  don't remember their name.

22      Q.   Okay.  EMTB, LLC, who were the managers from

23  2018 to 2021?

24      A.   I don't know.

25      Q.   Okay.  Do you have any records of those

1  managers?

2      A.   They would be in the employment records.

3          MR. TURNER:  Okay.  Let's take another

4      ten-minute break, and I'll be wrapping up this

5      portion.

6          MR. GEAR:  Okay.  Can we call it five?

7          MR. TURNER:  Yeah, that works.

8          THE VIDEOGRAPHER:  The time is 12:05 p.m.  We

9      are going off the record.

10         (Recess from 12:05 p.m. until 12:12 p.m. )

11         THE VIDEOGRAPHER:  The time is 12:12 p.m., and

12     we are back on the record.

13 BY MR. TURNER:

14     Q.   Mr. Tomkovich, you stated managers kind of

15 direct the operations at each of your clubs, correct?

16     A.   Yes.

17     Q.   Those managers, do they have the authority to

18 hire and fire the employees that work there?

19     A.   Yes, to a point.

20     Q.   Do they have the authority to hire or allow

21 dancers to work at your clubs?

22     A.   Is "hire" the correct word if they're not an

23 employee?

24     Q.   Yeah.  Let me strike that.

25          Do they have the authority to allow dancers to

1  work at your clubs?

2      A.    Yes.

3      Q.    Okay.  Because you don't personally sign off on

4  every dancer that works at every one of the clubs,

5  correct?

6      A.    Correct.

7      Q.    You also don't handle every dancer that is

8  banned from every one of your clubs, correct?

9      A.    Correct.

10      Q.    All right.  But you direct the managers of how

11  they are supposed to handle business at your clubs,

12  correct?

13      A.    Yeah.  I like to think so.

14      Q.    Do you have the -- sorry.  What was that?

15      A.    I said, I like to think so.

16      Q.    Do you handle or oversee the operations or the

17  duties of the managers?

18      A.    Not directly.

19      Q.    Okay.  But generally?

20      A.    In a general form, probably.

21      Q.    Okay.  Are you -- do you have the authority to

22  give the managers certain directions?

23      A.    Yes.

24      Q.    And I'm assuming, but you can correct me if I'm

25  wrong, do you have the keys to all of the clubs that you

1  own?

2      A.    No.

3      Q.    Okay.  The managers are the ones that have the

4  keys?

5      A.    Yes.

6      Q.    Okay.  Do the dancers have keys at all?

7      A.    No.

8      Q.    Do your clubs advertise?

9      A.    Yes.

10     Q.    What methods do they use to advertise?

11     A.    Facebook, Instagram, radio, TV.

12     Q.    So social media, radio, TV.  Do you also have

13  billboards?

14     A.    No.

15     Q.    Okay.  What about newspaper?

16     A.    Where would you find one of those any longer?

17     Q.    Great point.

18     A.    Sorry.  I thought that was a little --

19  rephrase, rephrase with us, you know.

20     Q.    Yeah.

21     A.    I'll say no on any -- any newspaper.

22     Q.    Okay.

23     A.    Probably 20 years ago, yes.  But today, no.

24     Q.    Okay.  Do you oversee the general revenue from

25  all of your clubs?

1    MR. GEAR:  Objection; form.  Can you -- can you

2  restate that?

3    MR. TURNER:  Yes.

4  Q.   Do you know generally how much your clubs make

5  every year?

6  A.   Yes.

7    (Exhibit 9, remotely introduced and provided

8  electronically to the reporter, was marked for

9  identification.)

10  Q.   Okay.  I am going to introduce as Exhibit 9, I

11  believe now, the sales breakdown that you produced.

12  This is 2021 through 2023.

13    Can you see my screen?

14  A.   Yes.

15  Q.   And this is for Entertainment 2851, correct?

16  A.   Yes.

17  Q.   For the first part of this year, it's blank for

18  January through May.  Does that mean that the club was

19  not open?

20  A.   Yes.

21  Q.   Okay.  And was that still due to the pandemic?

22  A.   No.

23  Q.   Okay.  Why was it not open?  Was that before

24  it -- oh, you took over management?

25  A.   Yes, yes, before I got the place back.

1    Q.   Okay.  And what do you mean by you got the

2  place back?

3    A.   There -- there was a tenant.  I sold the

4  building.  There was a tenant in there.  They couldn't

5  make the payments.  And I took the -- the deed back in

6  lieu of foreclosure.

7    Q.   Okay.  Okay.  So the tenant, did they also

8  operate a adult entertainment club?

9    A.   Yes.

10   Q.   And for 2021, the total sales right here is a

11  little under 295,000?

12   A.   Yes.

13   Q.   And that's for June through December, correct?

14   A.   Yes.

15   Q.   All right.  And then if we go to 2022.  Let's

16  see.  This is the first full year that you have

17  ownership at, of the building, correct?

18   A.   Yes.

19   Q.   All right.  And then I see in November and

20  December, that's zero.

21        Was the club closed those months?

22   A.   Yep.

23   Q.   And why was that?

24   A.   They weren't making enough money to pay the

25  bills.

1     Q.   Okay.  And --

2     A.   It was cheaper to be closed than to be open.

3     Q.   Okay.  And the total sales from that year was a

4 little under 460,000, correct?

5     A.   Yes.

6     (Exhibit 10, remotely introduced and provided

7 electronically to the reporter, was marked for

8 identification.)

9     Q.   Okay.  All right.  And I'm going to use as

10 Exhibit 10 the sales breakdown for Emperor's, Inc.,

11 which is the nude club on Adamo Drive, correct?

12     A.   Yes.

13     Q.   All right.  And for that club in 2021, the

14 total sales was a little over $500,000, correct?

15     A.   (There was no response.)

16     Q.   I will make that bigger for you.

17     A.   I'd have to go back and check.  I thought it

18 was under 500,000, but.  Yeah, because there is a --

19 there is a 7,000 right there, of December even.  That

20 wouldn't have been -- that wouldn't have been correct.

21     Q.   Okay.  So this, this 7,000 from beverages, is

22 incorrect?

23     A.   Yeah.  I believe so.  I think it was -- it was

24 less than that.  It's too even of a number to -- to have

25 there.

1    Q.    Okay.  So that 7,000 is incorrect.  So it was a

2  little bit less than --

3    A.    Might have been --

4    Q.    -- 7,000?

5    A.    Yeah.

6    Q.    And it's --

7    A.    Also, in this sales report, that is a gross

8  figure with sales tax included.  So you are going to

9  have to back out seven percent out of it, out of the

10  total anyway.  Those, those are gross figures with sales

11  tax included.

12    Q.    Of course.  All right.

13    A.    So it's under 500,000.

14    Q.    But, yeah, we're just talking about the gross

15  right now.  So the gross was slightly under 500,000?

16    A.    Yes.

17    Q.    And the -- there are columns here:  the month;

18  the food amounts, which is about 12,000.  The beverage

19  amount was, if we take out the 7,000, a little over

20  80,000.

21          Which the alcohol, that's empty, do you know

22  why that is?

23    A.    They don't serve any alcohol.

24    Q.    Okay.  That's because it is a nude location,

25  correct?

1    A.    Well, in Hillsborough County, a nude location
2  without alcohol.
3    Q.    Correct.  And then can you explain what this
4  "incidentals" column is?
5    A.    I believe that's a combination of a cover
6  charge and -- well, it would be cover charges, but the
7  cover charge going into the VIP and cover charge coming
8  into the building itself.
9    Q.    Okay.  So that was going to be my next
10 question.  For each of your clubs, and I guess
11 specifically for Emperor's, Inc., there is a cover
12 charge to enter the building?
13    A.    Yes.
14    Q.    Are you aware of what that coverage charge is?
15    A.    It ranges from 5 to 10 dollars.
16    Q.    Okay.  And does that depend on the time of day
17 and the day of the week?
18    A.    The day of the week, there is no coverage
19 charge during the day shift at any location.
20    Q.    Okay.  So at nighttime during the week, it's
21 $5; and then at nighttime during the weekend, it's $10?
22    A.    Yes.  That would be a good -- good synopsis for
23 that.
24    Q.    Okay.  And so incidentals include that cover
25 charge to get into the building and then also the -- the

```
 1   rental fee for --
 2       A.   The room charges.
 3       Q.   Right.
 4            For the VIP and the champagne rooms?
 5       A.   Yes.
 6       Q.   Okay.  And so that is the biggest source of
 7   revenue for -- for the club, correct?
 8       A.   Yes.
 9       Q.   And going back to the cover charge, do the
10   dancers have any say on what the cover charge is for
11   your clubs?
12       A.   No.
13       Q.   Who hires the DJs for your clubs?
14       A.   The manager.
15       Q.   Do the dancers at any of your clubs have any of
16   the managing responsibilities?
17       A.   No.
18       Q.   And the dancers don't pay for the advertising
19   we discussed, correct?
20       A.   Correct.
21       Q.   Did Emperor's have a stage?  Emperor's, Inc.,
22   at the new location, does it have a stage?
23       A.   Yes.
24       Q.   And that was the stage that was -- was paid
25   for, built out by you, correct?
```

A.   Yeah, by the company, yes.

MR. TURNER:  All right.  I have no further
questions for you today.

I want to clarify that I am not ending or
concluding this deposition.  I'm reserving the right
to continue this deposition once I have the
documents regarding the Adamo Drive locations and
Ms. Burgos's and the other dancers' documents
regarding those -- those locations, the sign-in
sheets for Entertainment 2851 and the Emperor's,
Inc., and EMTB, LLC, sign-in sheets.

So all of the documents that are requested on
the deposition notice, I'm still expecting to
receive those for the other clubs outside of
Entertainment 2851 LLC.

But with that, I have no further questions
today.

MR. GEAR:  Okay.  We'll go off.

THE VIDEOGRAPHER:  The time is now 12:25 p.m.
Eastern time, 4:25 UTC.  We're going off the record.

MR. TURNER:  Ms. Peterson, did you  --

MR. GEAR:  We are --

MR. TURNER:  -- have any spellings?  Trescot, I
thought I heard you for a second but you --

MR. GEAR:  I am still here.

1        THE REPORTER:  Are you going to send me the

2   exhibits?

3        MR. TURNER:  Yes, I'll send you the exhibits.

4        (There was a discussion off the record.)

5        MR. GEAR:  The deponent will read.  We'll read.

6        THE REPORTER:  Justice, are you ordering at

7   this time?

8        MR. TURNER:  Yes.  We will be ordering.

9        THE REPORTER:  Mr. Gear, do you want a copy?

10        MR. GEAR:  Yes.

11        (The proceedings adjourned at 12:29 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF SARASOTA

5

6         I, Donna L. Peterson, Registered Diplomate

7    Reporter, Notary Public, State of Florida, certify that

8    Michael Tomkovich remotely appeared before me on

9    September 13, 2023, and was duly sworn.

10         Signed this 18th day of September, 2023.

11

12

13

14

15         _____

16         Donna L. Peterson, RDR, CRR

17         Notary Public, State of Florida

18         Commission No.:  HH 396520

19         Commission Expires:  August 7, 2027

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF SARASOTA

I, Donna L. Peterson, Registered Diplomate Reporter and Certified Realtime Reporter, certify that I was authorized to and did remotely stenographically report the deposition of Michael Tomkovich, pages 1 through 76; that a review of the transcript was requested, and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in this action.

Dated this 18th day of September, 2023.

_____
Donna L. Peterson, RDR, CRR
Registered Diplomate Reporter
Certified Realtime Reporter

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS PAGE

IN RE:  Burgos v. Entertainment 2851, LLC, et al.
MICHAEL TOMKOVICH
September 13, 2023
US Legal Job No. 6451933-001

Page No.___Line No._____ Change_____ Reason

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____     _____
Date                    MICHAEL TOMKOVICH

WITNESS NOTIFICATION LETTER


September 18, 2023

MICHAEL TOMKOVICH
c/o TRESCOT J. GEAR, ESQUIRE
Gear Law, LLC
1405 West Swann Ave
Tampa, Florida  33606-2532
E-mail:  trescot@gearlawllc.com


In Re:       Burgos v. Entertainment 2851, LLC, et al.
             Deposition, taken on September 13, 2023
             U.S. Legal Support Job No. 6451933-001


The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office at the below address or via e-mail to:
Southeastproduction@uslegalsupport.com.


Sincerely,

Donna L. Peterson, RDR, CRR
U.S. Legal Support, Inc.
ATTN:  Production
16825 Northchase Drive, Suite 900
Houston, TX 77060-6004

CC via transcript:
Justice D. Turner, Esq.

# EXHIBIT 3



M-SAT 12-8
SUN 6-3AM

## PERFORMER LICENSE
## AND TEMPORARY SPACE LEASE AGREEMENT

**NOTICE: THIS IS A LEGAL CONTRACT THAT AFFECTS THE LEGAL RIGHTS OF THE PARTIES TO THIS AGREEMENT- READ IT!**

**BUSINESS NAME** Emperors Pasco _____ (the "BUSINESS" or "CLUB")

### I. PERFORMER INFORMATION

**PLEASE MAKE SURE THAT ALL INFORMATION IS PRINTED IN A LEGIBLE AND CLEAR MANNER**

**LAST NAME:** Burgos

**FIRST NAME:** Janee

**DATE OF BIRTH:** 8/15/82

**STAGE NAME:** Daniella

**ADDRESS:** 338 wellswood dr PC 33511
STREET          CITY          STATE          ZIP CODE

**PRIMARY PHONE:** 813 618 237 ADDITIONAL PHONE:

**DRIVERS LICENSE:** Fl 204300 754 (LIST ISSUING STATE AND NUMBER, ATTACH A COPY)

**SECONDARY FORM OF IDENTIFICATION:**

**NOTICE: All ID must comply with House Bill 989, requiring the Club to maintain a copy of the Applicant's Driver's License, State or Federal Government Issued Photo ID, and a record of the verification of the validity of identity and age verification document with the issuer.**

**SOCIAL SECURITY NUMBER:** 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

**EMERGENCY CONTACT INFORMATION:** Roberto Ortiz (917) 915-0830

**DATE THIS FORM COMPLETED:** 6-19-21

### II. ACKNOWLEDGEMENTS OF VOLUNTARY AND MEANINGFUL REVIEW OF THIS AGREEMENT

**PERFORMER ACKNOWLEDGES THAT PERFORMER HAS READ AND REVIEWED THIS AGREEMENT, INCLUDING THE INCLUDED TERMS AND CONDITIONS, IN ITS ENTIRETY, and THAT PERFORMER HAS BEEN GIVEN AN OPPORTUNITY TO ASK THE CLUB ANY QUESTIONS OR EXPRESS ANY CONCERNS ABOUT THIS**

1

PERFORMER 

DOCUMENT, AND THAT <u>PERFORMER HAS HAD AN OPPORTUNITY TO</u> <u>CONSULT WITH AN ATTORNEY OF HIS OR HER CHOICE</u> PRIOR TO ENTERING INTO THIS AGREEMENT. PERFORMER ACKNOWLEDGES THAT, BY SIGNING THIS AGREEMENT, PERFORMER UNDERSTANDS THE TERMS AND CONDITIONS OF THIS AGREEMENT AND KNOWINGLY AND FREELY AGREES TO ABIDE BY THEM.

THIS AGREEMENT REPLACES AND SUPERSEDES ANY PRIOR AGREEMENT BETWEEN THE PARTIES, AND SINCE THIS AGREEMENT IS THE MOST ACCURATE DESCRIPTION OF THE NATURE OF THE RELATIONSHIP OF THE PARTIES, AND REPRESENTS WHAT THE "MEETING OF THE MINDS" HAS BEEN SINCE THE PARTIES ESTABLISHED THEIR RELATIONSHIP, THE TERMS AND CONDITIONS HEREIN ARE DEEMED EFFECTIVE FROM THE DATE OF ANY PRIOR AGREEMENT OR RELATIONSHIP BETWEEN THE PARTIES, SHOULD ONE EXIST.

### III. THE AGREEMENT

THIS AGREEMENT is made this ___ day of _____, 20___ by and between _____ hereinafter referred to as "Business," and _____, hereinafter referred to as "PERFORMER."

WHEREAS: The Business has the authority to License and/or lease time, stage space, VIP rooms, dressing rooms and stage access to PERFORMER at its nightclub by contractual arrangements;

WHEREAS: PERFORMER is a self-employed, independent entity engaged in PERFORMER's independently established business, and PERFORMER *elects not to be classified as an employee,* and agrees to maintain performance characteristics consistent with non-employee status;

WHEREAS: PERFORMER desires to obtain stage use and time at facilities under contract with Business via a nonexclusive license/lease (the "License"), from time to time, to entertain audiences in order that PERFORMER may earn income in the form of retaining the Business' "dance fees," which would, if the PERFORMER was classified as an employee, be the property and income of the Business, as well as gratuities from the Business' patrons derived from providing entertainment appearances; it is AGREED that the PERFORMER and the Business enter into the following AGREEMENT, and, that in consideration of the mutual covenants contained herein, the parties agree as follows:

<u>GENERAL TERMS:</u>

*<u>NATURE OF RELATIONSHIP:</u>*

<u>The Business and Performer each acknowledge and agree that the relationship of the parties hereto is that of The Business as "Licensor" and "Lessor" and Performer is a Licensee and Temporary Space Lessee and no employee/employer relationship exists between the Business and Performer. Nothing in this Agreement shall be construed so as to create an employee/employer relationship between the parties hereto. Performer shall be solely responsible for obtaining and maintaining, at Performer's sole cost and expense, all necessary business licenses and permits and insurance including but not limited to, health, disability and worker's compensation and for paying all federal, state and local taxes and contributions imposed upon any income earned by Performer at the Business.</u>

2

PERFORMER 

**The Business and Performer acknowledge and represent that if the relationship between them was that of employer and employee, the Business would be required to collect, and would retain, all Performance Fees paid by customers to Performer. Performer acknowledges and agrees that if the relationship were one of employer/employee, all Performance Fees would be the property of the Club. THE PARTIES ACKNOWLEDGE AND REPRESENT THAT PERFORMER'S RIGHT TO OBTAIN AND KEEP PERFORMANCE FEES PURSUANT TO THIS LICENSE IS SPECIFICALLY CONTINGENT UPON THE BUSINESS RELATIONSHIP OF THE PARTIES BEING THAT OF THE BUSINESS BEING A LICENSOR AND TEMPORARY SPACE LESSOR AND PERFORMER BEING A LICENSEE AND TEMPORARY SPACE LESSEE.**

**In order to comply with applicable tax laws and to assure that the Business is not unjustly harmed and that Performer is not unjustly enriched, the Business and Performer agree that if upon any ruling or decision of an arbitrator, court or other tribunal with jurisdiction over the matter that the relationship is one of employer/employee, Performer shall surrender, reimburse and pay to the Business, all Performance Fees received by Performer at any time she performed on the Premises – all of which would otherwise have been collected and kept by the Business had they not been retained by Performer under the terms of this License and Temporary Space Lease – and shall immediately provide a full accounting to the Business of all tip income which he/she received during that time;**

**Any Performance Fees that Performer fails to repay to the Business are deemed service charges to the customer and as such the Business shall be entitled to offset any wage obligations by any amount not returned by the Performer. This provision shall apply to any such dance fees, regardless of whether the Business makes such fees part of its gross income at the time the Performer receives such dance fees from a Business patron.**

The Business is interested only in providing temporary space under this AGREEMENT and the manner and means of performing such professional services are under the sole control of the Performer, subject to the covenants contained herein, and agreed as follows:
The benefits provided by the Business to its employees, including, but not limited to, compensation insurance and unemployment insurance *are not available from the Business to the Performer.* The Performer may present or practice services for others during those periods when he/she is not performing under this AGREEMENT within the Business. The Business may, during the term of this Contract, also allow others to lease temporary space to other Performers to perform professional services for Business' patrons that the Performer herein performs, with *no right of exclusivity* directly or indirectly stated or inferred.

### ENGAGEMENT:

The Business hereby allows the professional services of the PERFORMER to occur at the Business establishment or any other location that has employed the services of the Business. The PERFORMER agrees to utilize the business premises according to the terms and conditions as agreed upon by the Business and the PERFORMER in this AGREEMENT.

### BUSINESS WILL HONOR PERFORMER'S CHOSEN LEASE SCHEDULE:

In the agreed utilization of the Business' premises herein contemplated by the PERFORMER, the PERFORMER has the sole authority to control and direct her service performances with the Business being interested only in the leasing space within the Business premises to enable the

3

PERFORMER 

PERFORMER to engage in her independent profession pursuant to this Agreement. Because of the demand on the Business' space and resources, for the benefit of all parties, a set schedule will be made available to the PERFORMER which will be honored to prevent crowding or complications caused by an overabundance of PERFORMER's. The agreed upon minimum lease period, as established through Lease Schedules, will be maintained by the parties, and the utilization of the premises, as contemplated herein shall comply with the covenants stated herein.

**MODEL RELEASE** License to use image. In further consideration for the Club or Business' grant of this license. Licensee agrees that Club or Business, or its affiliates, may use Licensee's image for the purpose of advertising her performance, the Club or Business' activities, or for any other lawful purpose, including on the internet or the Club or Business' websites.

**HOLD HARMLESS.** In further consideration to the Club for entering into this License Agreement, Performer for herself, her heirs, Personal Representatives, successors and assigns hereby covenants and agrees that neither the Club, it shareholders, officers, directors or employees shall be liable to Licensee with regard to any injury to Licensee's person or property which may occur while Licensee is on the premises of the Club, unless caused by the intentional or willful act of any of the foregoing persons. Further, Licensee agrees to inform Company immediately if she is harassed, assaulted or propositioned to commit an unlawful act by any patron, contractor, licensee or employee of Company.

## THE BUSINESS IMPOSES NO RULES OR RESTRICTIONS, BUT PERFORMER AGREES TO COMPLY WITH ALL APPLICABLE LAWS:

The PERFORMER agrees to comply with all federal, state, and municipal laws, rules and regulations pertaining to her performances and/or activities in the Business that are now or may in the future become applicable to the PERFORMER, and if she does not comply with such laws, she is solely liable for her actions and in no way, will the Business approve of such actions occurring while she is performing under the terms of this AGREEMENT. As required by governmental regulation, sexual activities and any use of controlled substances are strictly prohibited, as are any violations of other State or local laws. Any violations of these laws may result in termination of any lease or license granted by this AGREEMENT and permanent prohibition from the business premises.

PERFORMER recognizes that the Business holds one or more valuable governmental licenses, approvals, and/or permits for the conduct of business on the Premises and that such licenses, approvals, and/or permits may be the subject of actions to have such entitlements revoked, canceled, suspended or withdrawn as a result of allegations of certain illegal, immoral, or otherwise objectionable behavior on the Premises by PERFORMER or any other contracting party. PERFORMER acknowledges that the Business will experience significant economic damage and irreparable harm if such revocation, cancellation, suspension or withdrawal occurs. Accordingly, PERFORMER represents and warrants to the Business that PERFORMER has never been convicted of any crime involving moral turpitude; including, but not limited to, prostitution and PERFORMER agrees that PERFORMER shall not engage in any of the following activities on or about the Business Premises: Lewd acts; gambling; soliciting for prostitution, or engaging in prostitution; consuming alcoholic beverages if under the age of 21 years; possessing or using drugs or other illegal or controlled substances; possessing contraband or weapons; including, without limitation, knives and guns; fighting or otherwise engaging in

4

PERFORMER 

physical or verbal confrontations with any other person of any description on the Business' premises; leaving the Business Premises with any customer or patron of Business for any unlawful activity. Engaging or attempting to engage in any other conduct or activity which has the effect of causing any governmental entity to attempt the revocation, cancellation, suspension or withdrawal of licenses, permits or other governmental authorizations or approvals required by the Business to conduct business on the Premises in the ordinary and customary manner will result in termination of any lease or license granted by this AGREEMENT and permanent prohibition from the Business premises.

## INDEPENDENT NATURE OF THE RELATIONSHIP:

The Business shall engage in no conduct that would intentionally violate any state or federal wage or labor law, including but not limited to the Fair Labor Standards Act or any applicable state wage and hour or employment regulations or laws. All aspects of this AGREEMENT are also designed to protect the public health, safety, and welfare, as a basis to the use of the premises by the Temporary Space Lessee, and deemed necessary and appropriate to ensure the provisions set forth above. PERFORMER agrees to be bound by, and otherwise adhere to each and every policy and custom articulated herein by Business in connection with the Business' premises. Additionally, the following policies are agreed to by the parties:

## PERFORMER'S WARDROBE AND COSTUMES:

PERFORMER shall supply his/her own costumes and wearing apparel of any kind and nature, and the Business shall have no responsibility or liability in connection therewith. Acts and Routines are at the discretion of the PERFORMER, subject to the conduct provisions of this AGREEMENT requiring compliance with the law.

## NATURE OF PERFORMANCE:

Business shall have no right to direct or control the nature, content, character, manner, or means of PERFORMER's performance. PERFORMER acknowledges and agrees that his/her performance may include live nude, semi-nude or costumed entertainment consistent with the type of entertainment regularly legally performed at the Business premises.

## LEASE RENTAL PAYMENTS:

In exchange for the use of PERFORMER's use of the Business premises shall pay a rental lease fee as shown in the attached Exhibit, depending on variables such as time of day and saturation level of patronage. The PERFORMER must secure and reserve all requested times, which may include a minimum daily or periodic appearance, and PERFORMER agrees to perform during all hours of each shift for which she has reserved the Business' premises. The rental is due and payable on the day of each performance.

## ACKNOWLEGEMENT OF SOURCE OF PERFORMER'S INCOME:

Any and all income to be received by the PERFORMER shall be from customers directly, in the form of an "assignment" of dance fees for performances which, if the PERFORMER was an

5

PERFORMER

employee, would be the property of the Business, and any gratuities over and above the specified dance fees. Said income will be attributed to the equivalent of earning at least "minimum wage" as required by any applicable regulation, but will not be paid directly from the Business. Business is a conduit between the performer and customer and at times an exchange in script, funny money, or gift certificates, if such policy is implemented.

## PERFORMER HAS NO EXCLUSIVITY REQUIRED:

PERFORMER is free to perform at other establishments, without restriction, provided that she adheres to the schedule reservations of performance that she has requested and agreed to perform.

## PERFORMER IS OF LAWFUL AGE:

The undersigned PERFORMER represents that he or she is of legal age, over the age of 18 (eighteen) years, and legally capable to enter in AGREEMENTS.

## RELIANCE ON LEGAL DECISIONS TO SUPPORT THE NON-EMPLOYEE RELATIONSHIP:

Both the Business and the PERFORMER rely upon the judicial decisions addressing similar Lessor/License agreements such as this one, in the decisions of *Marlar Inc. v. United States*, and *J3R, Inc. v. United States,* among other decisions, which recognize the validity of similar lease agreements as that manifest herein.

## PERFORMER IS RESPONSIBLE FOR HER OWN TAX REQUIREMENTS:

As an independent entity, the PERFORMER acknowledges that he/she is required to file his/her own federal, state and local income tax returns and is fully responsible for reporting her earnings and the payment of all income taxes due and owing on such returns.

## PERFORMER'S PROMISE TO NOTIFY BUSINESS OF DESIRE TO BE CLASSIFIED AS AN "EMPLOYEE," AND TO RETURN DANCE FEES RETAINED, IF CHANGE OF DESIGNATION IS DESIRED:

PERFORMER acknowledges and agrees, that in the event that any governing federal or state agency determines that the relationship between the Business and PERFORMER is other than that of a Business and Lessee/Licensee, PERFORMER agrees to reimburse and otherwise hold Business harmless from any and all moneys determined to be due to PERFORMER should such designation be deemed improper. If any legal action is initiated or supported by PERFORMER by any assertion that the relationship is other than that of Business and Lessee/Licensee, then, in addition to the reimbursement hereto set forth, PERFORMER shall pay to Business all additional costs and expenses incurred by Business, or any principal thereto, including actual

6

PERFORMER 

and reasonable attorney's fees in defense of any such action which PERFORMER is or becomes a party to such action. Additionally, as a "condition precedent" to any claim of "misclassification" asserted by or on behalf of the PERFORMER, the PERFORMER must demand, in writing, that she be classified and treated as an employee, prior to bringing any action pursuing any remedy for any alleged misclassification.

**ATTORNEY'S FEES:**

In the event that a lawsuit or other legal services must be initiated or defended to enforce any aspect of this agreement, the prevailing party shall have a right to collect from the other party to this agreement any reasonable attorney's fees costs and/or expenses incurred in same, unless recovery of such fees are prohibited by local, state or federal law..

**AGREEMENTS OUTSIDE OF THIS AGREEMENT:**

This AGREEMENT contains the complete agreement between the parties and shall, as of the effective date hereof, supersede all other agreements between the parties.

**LEGAL AUTHORITY:**

The PERFORMER hereby warrants that she is of legal age and has the right to contract in her own name, that she has read this document entitled **PERFORMER LICENSE AND TEMPORARY SPACE LEASE AGREEMENT** document prior to its execution and that she is fully familiar with the contents thereof. This document shall be binding on PERFORMER and her heirs, legal representatives and assigns.

**RELEASE AND WAIVER:**

PERFORMER also acknowledges that PERFORMER utilizes the Business premises under this AGREEMENT entirely upon her own risk and responsibility and in consideration of her voluntary participation in the terms and conditions of this AGREEMENT. PERFORMER does hereby for herself, her heirs, executors and administrators remise, release, and forever discharge any and all officers, agents, and employee's heirs or assigns, acting officially or otherwise, from any and all claims, demands, actions or causes of action on account of any loss or injury to PERFORMER which may occur from any cause during the term of this AGREEMENT, in the utilization of the Business premises, as well as any operations incident thereto.

**GRIEVANCE AND ARBITRATION AGREEMENT**

The Business, which includes its parent corporation, affiliates, subsidiaries, divisions, successors, assigns and the current and former employees, officers, directors, and agents (hereafter collectively referred to as "the Business") seeks to work with its performers, temporary space lessees, licensees, independent contractors, and employees to resolve differences as soon as possible after they arise. Often times, differences can be eliminated through internal discussions.

7

PERFORMER _____

To facilitate dispute resolution through open communication, we have developed a binding grievance procedure, which ultimately ends in arbitration of disputes that are not resolved through the grievance process. Use of the Business's Grievance and Arbitration Agreement ("Agreement") binds both you, your heirs, administrators, executors, successors and assigns (hereinafter collectively referred to as "you" or "your") and the Business to grieve and arbitrate disputes, in lieu of litigating in court.

## THE AGREEMENT TO GRIEVE AND ARBITRATE: Overview

You are required to grieve and then, if necessary, arbitrate any and all disputes, claims, or controversies ("claim") against the Business as defined above including, but not limited to, all claims arising out of your employment, the separation of employment or any other dispute, including any claim that could have been presented to or could have been brought before any court. This Agreement to grieve and then, if necessary, arbitrate includes, but is not limited to, claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964; the Fair Labor Standards Act; the Family and Medical Leave Act; the Americans with Disabilities Act of 1990; Section 1981 through 1988 of Title 42 of the United States Code; any state or local anti-discrimination laws; or any other federal, state, or local law, ordinance or regulation, or based on any public policy, contract, tort, or common law or any claim for costs, fees, or other expenses or relief, including attorney's fees. All claims which could be raised before a court must be raised by the time of the arbitration and the arbitrator shall apply the law accordingly. As a condition precedent to arbitration, you must have exhausted all prior steps in the Business's grievance procedures, which are set forth below.

Likewise, the Business reciprocally and in consideration of this Agreement is required to grieve and then, if necessary, arbitrate any claim against you and also agrees to be bound by the terms of this Agreement regarding any matter covered herein or any other dispute it may have with you (unless otherwise stated in a written Agreement between the parties that explicitly limits the obligations herein). Claims not covered by this Agreement are claims for workers' compensation benefits and for unemployment compensation benefits, although mention of same does not concede applicability to the relationship described herein.

## THE GRIEVANCE PROCESS

### 1. General Principals of Confidentiality Which Apply To The Grievance And Arbitration Process

To the extent consistent with adequate investigation and appropriate corrective action, all of the grievance proceedings are confidential processes, and any information relating to these proceedings may not be disclosed except as needed in the ordinary course of business. Also all arbitration proceedings will remain confidential between the parties (and arbitrator).

### 2. Grievance Procedures For Employees To Follow

        a)    <u>Step One</u>

If you feel you have a problem, you should present the situation to the manager on duty or an

8

PERFORMER 

owner. Past experience shows that most problems can be settled by simple examination and discussion of the facts.

You are not required to present the situation to the manager on duty or the owner if you do not feel comfortable discussing the situation with those individuals. Under these circumstances, you can inform the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com.

### b)    **Step Two**

If you are dissatisfied with the manager's or your supervisor's response or you elect to bypass Step One, you may take the problem to the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com. To do this, you must complete a Dispute Resolution Form, which is available from any manager. The form requires that you set forth your grievance in writing, describing in as much detail as you can recall every act and event giving rise to your grievance, every witness and document which you believe supports your position, and the corrective measures you seek. Either a manager or the Club's attorney, Luke Lirot, will respond to your step two grievance, in writing, within ten (10) calendar days of your submission of a fully completed Dispute Resolution Form. The Business may extend this deadline by fifteen business days. The submission of a step two Dispute Resolution Form, upon receipt by the Business, postpones all limitation periods during the step two process.

The Business, in its sole and unreviewable discretion, may, in lieu of the Step Two appeal process, elect to require you to mediate your dispute. If the Business elects mediation, it must pay for all costs of the mediator and will seek to schedule the mediation within sixty (60) calendar days of submission of your Step Two Appeal Form. The mediation must occur within a seventy five mile radius of your current residence. If the Business elects mediation and it fails, you may proceed to Step Three - arbitration. The GRIEVANCE PROCESS SET FORTH ABOVE IS A CONDITON PRECEDENT TO ANY PARTICIPATION IN ARBITRATION.

### c)    **Step Three**

If you are dissatisfied with the results of Step Two appeal and/or mediation and your claim is one to which our Arbitration Agreement below applies, you have thirty (30) calendar days from receipt of the Step Two determination to file for final and binding arbitration in accordance with this Agreement. Only claims that could be brought in a court are subject to arbitration.

## THE ARBITRATION PROCESS

The decision or award of the arbitrator shall be final and binding upon the parties. The arbitrator shall have the power to award any type of legal or equitable relief available in a court of competent jurisdiction including, but not limited to, attorney's fees, to the extent such damages are available under law. Because any arbitral award may be entered as a judgment or order in any court of competent jurisdiction, any relief or recovery to which you may be entitled upon any claim (including those arising out of employment, separation of employment, or any claim of

9

PERFORMER 

unlawful discrimination) shall be limited to that awarded by the arbitrator.

Subject to the postponement of limitation periods set forth herein, any claim for arbitration will be timely only if brought within the time in which an administrative charge or complaint would have been filed if the claim is one which could be filed with an administrative agency. If the arbitration claim raises an issue which could not have been filed with an administrative agency, then the claim must be filed within the time set by the appropriate statute of limitation.

**The parties agree that, subject to the exhaustion of the Grievance Process set forth above this Agreement is subject to binding arbitration pursuant to the Federal Arbitration Act (the "FAA"), and any disputes under this Agreement, as well as any and all issues arising out of any State or Federal Wage and Hour or Fair Labor Standards Act issues, or any other regulatory, administrative or other issue, including any disputes that may have arisen at any time during the relationship between the parties, will be governed and settled by an impartial independent arbitrator appointed by the American Arbitration Association, FLORIDA branch, and the determination of the arbitrator shall be final and binding (except to the extent there exist grounds for vacation of an award under applicable arbitration statutes). THE PARTIES MAY AGREE TO UTILIZE ANOTHER QUALIFIED ARBITRATION SERVICE. The parties agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to any proceedings commenced under this Section.**

**EACH PARTY SHALL BEAR ITS OWN FEES AND COSTS IN ARBITRATION, absent any legal or administrative rule to the contrary. The arbitration provision contained herein shall be self-executing and shall remain in full force after expiration or termination of this Agreement. In the event, any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise, notwithstanding such failure to appear. The place of arbitration shall be HILLSBOROUGH COUNTY, FLORIDA. The arbitrator shall give effect insofar as possible to the desire of the parties hereto that the dispute or controversy be resolved in accordance with good commercial practice and the provisions of this Agreement. To the fullest extent permitted by law, the arbitrator shall apply the commercial arbitration rules of the American Arbitration Association and Title 9 of the U.S. Code, except to the extent that such rules conflict with the provisions of this Section in which event the provisions of this Section shall control, so long as allowed by law.**

**THE PARTIES WAIVE ANY RIGHT TO LITIGATE SUCH CONTROVERSIES, DISPUTES, OR CLAIMS IN A COURT OF LAW, AND WAIVE THE RIGHT TO TRIAL BY JURY. ALL PARTIES SHALL HAVE THE RIGHT TO BE REPRESENTED BY LEGAL COUNSEL AT ARBITRATION. THE ARBITRATOR SHALL PERMIT REASONABLE DISCOVERY. THE PARTIES SHALL HAVE THE RIGHT TO SUBPOENA WITNESSES IN ORDER TO COMPEL THEIR ATTENDANCE AT HEARING AND TO CROSS-EXAMINE WITNESSES, AND THE ARBITRATOR'S DECISION SHALL BE IN WRITING AND SHALL CONTAIN FINDINGS OF FACT AND CONCLUSIONS OF LAW. THE ARBITRATOR'S DECISION SHALL BE FINAL, SUBJECT ONLY TO REVIEW PURSUANT TO THE FAA. THE ARBITRATOR SHALL HAVE EXCLUSIVE AUTHORITY TO RESOLVE ANY AND ALL DISPUTES OVER THE VALIDITY OF ANY PART OF THIS AGREEMENT, AND ANY AWARD BY THE ARBITRATOR MAY BE ENTERED AS A JUDGMENT IN ANY COURT HAVING JURISDICTION.**

10

PERFORMER 

**PERFORMER UNDERSTANDS AND ACKNOWLEDGES THAT BY SIGNING THIS AGREEMENT HE/SHE SPECIFICALLY WAIVES ANY RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR COLLECTIVE ACTION AND IF AT ANY TIME PERFORMER IS DEEMED A MEMBER OF ANY CLASS CREATED BY ANY COURT IN ANY PROCEEDING, HE/SHE WILL "OPT OUT" OF SUCH CLASS AT THE FIRST OPPORTUNITY, AND SHOULD ANY THIRD PARTY PURSUE ANY CLAIMS ON HIS/HER BEHALF, PERFORMER SHALL WAIVE HIS/HER RIGHTS TO ANY SUCH MONETARY RECOVERY.**

**MISCELLANEOUS:**

This Agreement constitutes the entire understanding of the parties. No representations or warranties have been made by either party to the other, or by anyone else, except as expressly set forth in this Agreement. No prior oral or written statements, representations, promises and inducements have been made by either of the parties relating to the subject matter hereof which are not embodied in this Agreement. If any provision of this Agreement or the application thereof to any person or circumstance shall, for any reason and to the extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to the other person or circumstance shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law. The Club's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect the validity or enforceability of this Agreement or operate or be construed as a waiver of any future enforcement of that provision or any other provision of this Agreement.

The PERFORMER acknowledges that he/she has received and reviewed this document in its entirety and has received a copy of same, as evidenced by the signatures below.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT on this ___ day of _____, 20 __.

THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS.

**BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE THOROUGHLY REVIEWED EVERY WORD IN THIS AGREEMENT, THAT YOU HAVE HAD AN OPPORTUNITY TO PREENT THIS TO AN ATTORNEY IF ANY PART OF THIS AGREEMENT IS UNCLEAR, AND THAT YOU HAVE DONE SO OR ARE WAIVING THAT RIGHT, AND THAT YOU DO NOT NED ANY ADDITIONAL TIME TO REVIEW OR CONSIDER THIS AGREEMENT AND ARE SIGNING IT KNOWINGLY, VOLUNTARILY AND LAWFULLY:**

_____
PERFORMER Signature

Print Name: _Jamie Buiggs_

DATE _June 19.2021_

11

PERFORMER _____

Witness Signature

Print Name: _____

Describe and Attach Picture ID of TSL

_____
BUSINESS REPRESENTATIVE

_____
Witness Signature

Print Name: Jeffrey M. VHold

$\frac{6 \cdot /9 \cdot 21}{\text{DATE}}$

12

PERFORMER

# Grievance Form

Name: _____ Date: _____

Agreement date: _____

Home Mailing Address: _____

Work Mailing Address: _____

Phone:_____ Email:_____

| Date, Time, and place of event leading to grievance: |
| --- |
| |

| Detailed account of occurrence (include names of persons involved, if any): |
| --- |
| |

| Please state policies, procedures, or guidelines that you feel have been violated: |
| --- |
| |

1

| Proposed solution to grievance: |
| --- |
| |

The grievant should retain a copy of this form for his or her records. The signature below indicates that you are filing a grievance, and any information on this form is truthful.

_____     _____
Signature                                                                            Date

_____     _____
Received by                                                                        Date

## Grievance Procedures To Follow

### Step one:

If you feel you have a problem, you should present the situation to the manager on duty or an owner. Past experience shows that most problems can be settled by simple examination and discussion of the facts.

You are not required to present the situation to the manager on duty or the owner if you do not feel comfortable discussing the situation with those individuals. Under these circumstances, you can inform the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com.

### Step two:

If you are dissatisfied with the manager's or your supervisor's response or you elect to bypass Step One, you may take the problem to the Club's attorney, Luke Lirot, at 727-536-2100, and/or via email to Luke2@lirotlaw.com. To do this, you must complete a Dispute Resolution Form, which is available from any manager. The form requires that you set forth your grievance in writing, describing in as much detail

as you can recall every act and event giving rise to your grievance, every witness and document which you believe supports your position, and the corrective measures you seek. The Club's attorney, Luke Lirot, will respond to your step two grievance, in writing, within ten (10) calendar days of your submission of a fully completed Dispute Resolution Form. The Business may extend this deadline by fifteen business days. The submission of a step two Dispute Resolution Form, upon receipt by the Business, postpones all limitation periods during the step two process.

The Business, in its sole and unreviewable discretion, may, in lieu of the Step Two appeal process, elect to require you to mediate your dispute. If the Business elects mediation, it must pay for all costs of the mediator and will seek to schedule the mediation within sixty (60) calendar days of submission of your Step Two Appeal Form. The mediation must occur within a seventy five mile radius of your current residence. If the Business elects mediation and it fails, you may proceed to Step Three - arbitration. The GRIEVANCE PROCESS SET FORTH ABOVE IS A CONDITON PRECEDENT TO ANY PARTICIPATION IN ARBITRATION.

**<u>Step Three:</u>**

If you are dissatisfied with the results of Step Two appeal and/or mediation and your claim is one to which our Arbitration Agreement below applies, you have thirty (30) calendar days from receipt of the Step Two determination to file for final and binding arbitration in accordance with this Agreement. Only claims that could be brought in a court are subject to arbitration.

321

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on Friday, September 22, 2023 a true and correct copy of the attached **DECLARATION OF JUSTICE D. TURNER, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** and accompanying document were served via CM/ECF upon the following parties pursuant to Rule 5 of the Federal Rules of Civil Procedure:

Trescot Gear
Florida Bar Number 118216
**GEAR LAW, LLC**.
1405 West Swann Avenue
Tampa, Florida 33606
Tel.: (904) 654-6221
Fax.: (813) 337-0243
Email: Trescot@gearlawllc.com

*Attorney for Defendants*

*/s/ Justice D. Turner*
_____
Justice D. Turner